UNITED STATES of America,
Plaintiff-Appellee,

v.

Barry MILLS, Defendant-Appellant.

No. 82–8001.

United States Court of Appeals,
Eleventh Circuit.

May 20, 1983.

Stephanie Kearns (Ct. Appt.), Atlanta, Ga., for plaintiff-appellee.

Richard W. Hendrix, Asst. U.S. Atty., Atlanta, Ga., for defendant-appellant.

Before HILL and VANCE, Circuit Judges, and TUTTLE, Senior Circuit Judge.

VANCE, Circuit Judge:

Barry Mills appeals his conviction for murder and conspiracy to commit murder in violation of 18 U.S.C. §§ 1111 and 1117.

On May 20, 1979, John Sherman Marzloff was killed in the men's room of the recreation shack at the United States penitentiary in Atlanta, Georgia. His death was caused by sixteen stab wounds in the head, back, shoulder, and upper arm area. The murder weapon was tossed into the commode, and a second similar knife, unused in the killing, was tucked up under the arm of the victim. The details of the murder were reported, incorrectly, in an Atlanta newspaper. Although numerous witnesses testified to having seen Mills in the recreation shack area at the time of killing, the only eyewitness was Danny Holliday. Holliday, the prosecution's key witness, testified that he had accompanied Mills to the recreation shack, armed with the second knife, for the sole purpose of robbing Marzloff; that he had been surprised by the murder and had taken no part in it.

The prosecution's theory of the case was that the murder of Marzloff had been committed pursuant to an Aryan Brotherhood contract. The Aryan Brotherhood is a white supremacist prison gang. It originally was organized as a defensive organization during the prison racial violence of the 1960's, but now attempts to control drug traffic within the prison system through violent means. The prosecution offered extensive testimony that in a drug transaction Marzloff had cheated Tommy Silverstein, an Aryan Brotherhood "commissioner" in another penitentiary, that Tommy Silverstein had put out a contract on Marzloff, and that this contract had been communicated to Mills, also an Aryan Brotherhood "commissioner," by a letter channeled through someone on the streets. Included in the prosecution's evidence to show Mills' membership in the Aryan Brotherhood was a letter Mills had written from prison, using terms in the Aryan Brotherhood argot, referring to ongoing Aryan Brotherhood activities, and alluding to Mills' participation in other crimes. Mills now challenges the admissibility of nearly all this evidence.

Mills maintained that he was innocent, that the Aryan Brotherhood had ceased to be an active organization, and that the murder had actually been committed by Robert Lee Hogan, another inmate. Hogan, who had committed several unrelated murders with sexual overtones, had confessed to Marzloff's murder several times. He had also confessed to other murders, both corroborated and uncorroborated. Hogan was murdered in apparent retaliation for one such killing several months prior to Mills'

trial. The prosecution introduced extensive testimony to impeach Hogan's confession. Hogan's description of the details of the murder was factually incorrect, but identical to the erroneous report in the Atlanta newspaper. Hogan's psychological counselor at the Atlanta penitentiary, and her superior, the prison psychiatrist, testified that Hogan's psychopathology indicated he would have been incapable of Marzloff's murder but was fully capable of falsely confessing to it in order to ingratiate himself with the Aryan Brotherhood.

Both the prosecution and the defense acknowledged unusual credibility problems. In opening argument the prosecution stated that substantial documentation was needed to explain to a lay jury the prison culture of violence, drugs, and secret gangs. During closing argument, and again in its brief on appeal, the government admitted that Holliday's testimony of his own involvement, as an indicted coconspirator who had plea bargained to a lesser charge, was highly suspect. Prosecuting counsel urged the jury, during closing argument, to believe only so much of Holliday's testimony as could be corroborated. Mills conducted his own defense with the assistance of standby counsel. During his own opening argument, Mills told the jury that he was conducting his own defense because, as an insider to the prison system, he could expose the lies prisoners told and the compromises they made with the prosecution in an effort to play the prison survival game. He tried repeatedly to elicit testimony on cross-examination that witnesses had agreed to testify for the government in order to obtain parole advantages, and the safety and better conditions of the Witness Protection Program. The prosecution countered with elaborate testimony concerning the government witnesses' terror of the Aryan Brotherhood.

I

DELAY BETWEEN PLACEMENT IN DISCIPLINARY SEGREGATION AND THE INDICTMENT

■ Mills contends that his sixth amendment right to a speedy trial was denied by the eighteen and three quarter month delay between his placement in disciplinary segregation for Marzloff's murder and the date of the indictment. Because Hogan died during this time, Mills says that he was prevented from preparing the best possible defense. Since he could not leave segregation to interview Hogan himself, and had no access to appointed counsel prior to return of the indictment, he was unable to investigate the veracity of Hogan's confession or obtain exculpatory testimony.

■ Mills argues that the speedy trial guarantee of the sixth amendment applies because his placement in disciplinary segregation marked the beginning of the accusatory phase of the trial. Although the sixth amendment speedy trial guarantee is generally considered inapplicable to preindictment delay, *United States v. Lovasco,* 431 U.S. 783, 788, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971); *United States v. Lindstrom,* 698 F.2d 1154, 1157 (11th Cir.1983), certain other events, including arrest or the filing of an information, may also initiate the guarantee. *Dillingham v. United States,* 423 U.S. 64, 65, 96 S.Ct. 303, 304, 46 L.Ed.2d 205 (1975); *United States v. Rice,* 550 F.2d 1364, 1369 (5th Cir.), *cert. denied,* 434 U.S. 954, 98 S.Ct. 478, 54 L.Ed.2d 312 (1977). We previously have held that placement in segregation within a prison does not initiate the accusatory phase or trigger the sixth amendment. *United States v. Manetta,* 551 F.2d 1352, 1353–54 (5th Cir.1977); *United States v. Duke,* 527 F.2d 386, 390 (5th Cir.), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1190 (1976). Mills contends that his case is distinguishable because *Manetta* and *Duke* concerned "administrative" segregation for investigative purposes, whereas he was subjected to punitive "disciplinary" segregation upon a finding of guilt by the Institutional Disciplinary Committee. We conclude that the contention presents a distinction without a difference. In *Duke,* "administrative segregation" was described

as a method of "disciplining or investigating inmates," *United States v. Duke,* 527 F.2d at 390. This definition embraces the type of confinement to which Mills was subjected. We also explained in *Duke* that segregation within a prison is not equivalent to the onset of the accusatory phase because "administrative segregation of a prisoner is an internal disciplinary measure that is totally independent from the criminal processes of arrest and prosecution." *Id.* The prison segregation system remains equally distinct from the judicial system when its purpose is entirely punitive.

In the alternative, Mills argues that the delay denied him his right to a speedy trial under the due process clause of the fifth amendment. Under the more rigorous fifth amendment standard, he must make a twofold showing: "(1) that the delay caused actual prejudice to the conduct of his defense, and (2) that the delay was the product of deliberate action by the government designed to gain a tactical advantage." *United States v. Lindstrom,* 698 F.2d at 1157–58. Mills can meet the first prong of this test. His lack of access to Hogan's testimony was genuinely prejudicial to preparation of his defense. He cannot meet the second prong because he has failed to show any tactical advantage the prosecution could have hoped to gain by the delay. *Id.* at 1158. He has produced "no evidence even tending to show that the delay was a deliberate tactical maneuver by the government," *United States v. Hendricks,* 661 F.2d 38, 40 (5th Cir.1981), nor is any suggested by the circumstances. The prosecution could scarcely have foreseen that Hogan would be murdered before Mills came to trial. Further, Hogan's death was equally prejudicial to the government, which had to resort to elaborate secondary evidence to impeach Hogan's confession.

## II

### HYBRID REPRESENTATION

Mills requested but was denied permission for his appointed attorney to act as his cocounsel during trial. He now con-tends that the district court's refusal to allow such hybrid representation denied him his sixth amendment right to assistance of counsel. He does not claim that the intersection of the right to appointed counsel under *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) and the right to proceed *pro se* under *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) compels the conclusion that there is a constitutional right to hybrid counsel. Mills acknowledges that under the law of this circuit, the right to appointed counsel and the right to proceed *pro se* exist in the alternative and the decision to permit a defendant to proceed in a hybrid fashion rests in the sound discretion of the trial court. *United States v. Daniels,* 572 F.2d 535, 540 (5th Cir.1978); *United States v. Shea,* 508 F.2d 82, 86 (5th Cir.), cert. denied, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975). He maintains, however, that under the circumstances of this case the district court abused its discretion in failing to allow hybrid representation. During the discovery phase he was forced by the circumstances of his incarceration to rely on counsel to conduct his investigation. He argues that the pretrial hearings had been conducted in hybrid fashion and that the court did not deny his request to proceed with a hybrid defense until six days prior to trial, thereby encouraging him to rely on the likelihood of a hybrid defense. He claims that when he elected to proceed *pro se* he was left without the personal insights he might have had if he had been able to conduct his own discovery or if his attorney had been beside him at the counsel table during trial.

Regardless of the tactical advantages Mills might have gained from hybrid representation, the district court's refusal to permit it did not constitute reversible error. The court made substantial accommodations to assist Mills in the conduct of his *pro se* defense. Together with his standby attorney, he was provided an opportunity to interview all willing government and defense witnesses prior to each day of trial. The court assisted the defendant in providing relevant cases at his request, allowed

him to consult with his standby attorney during recesses, and had the standby attorney available throughout the trial. The record discloses that Mills, who had previously defended himself successfully while proceeding *pro se,* was poised, intelligent, articulate, and, for a layman, relatively well versed in the law. He raised objections promptly and appropriately and examined and cross-examined the witnesses thoroughly and skillfully. We can find no abuse of discretion.

## III

### SHIFTING THE BURDEN OF PROOF

■ Prior to the commencement of voir dire the court gave an introductory statement to the jury panel summarizing the allegations in the indictment and then stating, "the Defendant, Mr. Mills, has denied both of these charges, and therefore in this trial, the Government is seeking to prove that he is guilty, and he is seeking to prove that—seeking to show through his evidence that he, in fact, is not guilty of either of these charges." The jury was immediately impaneled and the first curative instructions were not given until after opening statements by both sides.

Mills claims that the initial misstatement on the burden of proof, coupled with the delay in the curative instructions, constitutes plain error. Citing *United States v. Apollo,* 476 F.2d 156 (5th Cir.1973) and *United States v. Garber,* 471 F.2d 212, 217 (5th Cir.1972), he argues that the court's correction came too late to defuse the harm because (1) it was several hours after the incorrect statement, (2) the misstatement was the first comment on the law the jury heard, giving it particular impact, and (3) since the curative instruction did not come until after opening argument, the jury's initial impression of what the evidence would show was tainted by the erroneous instruction.

We cannot agree. This single slip of the tongue by the trial judge occupied but a

"few seconds of a lengthy trial" and was unquestionably corrected before the jury heard any evidence and corrected again prior to the jury's deliberation at the close of the case. *United States v. James,* 510 F.2d 546, 550 (5th Cir.), *cert. denied,* 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975). "[W]hatever untoward effect the prohibited [misstatement] may have had . . . was vitiated by other instructions concerning the Government's burden of proof." *United States v. Chiantese,* 582 F.2d 974, 976 (5th Cir.1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979). *Accord United States v. Dunbar,* 590 F.2d 1340, 1343 (5th Cir.1979). The record is replete with the trial court's instructions to the impaneled jury that the government had the burden of proving defendant's guilt beyond a reasonable doubt, that the defendant was not required to call any witnesses or produce any evidence, that the defendant was presumed by law to be innocent and that this presumption alone was sufficient reason to acquit if the jury did not find him guilty beyond a reasonable doubt. These instructions adequately overcame any possible prejudicial effect resulting from the isolated comment made by the trial court prior to the impaneling of the jury.

## IV

### THE EVIDENTIARY RULINGS

Mills complains of the admission of (1) testimony on the organization, history, and activities of the Aryan Brotherhood, and (2) a letter he wrote in violation of prison regulations to another inmate at a different institution, which alluded to previous crimes and described Aryan Brotherhood activities. Much of the letter was written in the cryptic slang of the Aryan Brotherhood and was "translated" by the oral testimony of a government witness. Mills attempts to characterize the entirety of this testimony as evidence of "other crimes, wrongs, or acts" and thus as governed by Fed.Rule of Evid. 404(b).[1] The government maintains

---

1. Fed.Rule of Evid. 404(b) states:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissi-

that the testimony was intrinsic to the crime charged, and thus subject only to the admissibility standards of Fed.Rule of Evid. 403.[2]

■ Some of the evidence referred to illegal or otherwise improper acts which did not constitute elements of the crime charged in the indictment, but all of it pertained to a chain of events forming the context, motive, and set-up of the crime. To make the crime comprehensible to a jury it was necessary for the government to show how the Aryan Brotherhood functioned, that Mills was a member of the Aryan Brotherhood, that an affront to a fellow member might serve as an adequate motivation for Mills to kill a person whom he barely knew, and that it was possible for a member of the Brotherhood incarcerated in one federal prison to communicate the murder contract to another member in a different prison, despite mail censorship and restrictions on inter-inmate correspondence.

When "it is very difficult to draw a line between the crime charged and other wrongful circumstances with which it is inextricably intertwined," 2 J. Weinstein & M. Berger, Weinstein's Evidence § 404[10], p. 404–60 (1982), the intrinsic-extrinsic dichotomy blurs and loses legal significance. Such evidence, once deemed part of the *res gestae,* is now considered proper if it is linked together in time and circumstances with the crime charged, *United States v. Beechum,* 582 F.2d 898 (5th Cir.) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979) or if it forms an "inte-

gral and natural" part of the account of the circumstances of the crime, *United States v. Bloom,* 538 F.2d 704, 707 (5th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 814, 50 L.Ed.2d 792 (1977) or is necessary "in order to complete the story of the crime on trial." *United States v. Wilson,* 578 F.2d 67, 72 (5th Cir.1978). "It matters little whether the evidence is viewed as lying beyond the scope of Rule 404, or as satisfying the test of Rule 404(b)." Weinstein *supra* at § 404[10], p. 404–61.

In either case, however, the evidence is inadmissible if its probative value "is substantially outweighed by the danger of unfair prejudice," Fed.Rule of Evid. 403. *See also United States v. Beechum,* 582 F.2d at 911.[3] Mills contends that the cumulative impact of redundant evidence on the Aryan Brotherhood, elicited from witness after witness, denied him a fair trial.

■ The evidence required to prove motive and the events leading to Marzloff's murder was necessarily substantial because the Aryan Brotherhood is a covert organization within the prison system, a culture strange and foreign to a lay jury even in its most obvious aspects. Considerable additional evidence was needed to combat the defense theory that the Aryan Brotherhood had ceased to exist in the late 1970's and the natural question concerning the credibility of government witnesses, who were past or present convicts. Against this backdrop, the evidence on the Aryan Brotherhood was not prejudicially cumulative. The bulk of the testimony on the structure and practices of the Brotherhood was provided

ble to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

2. Fed.Rule of Evid. 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

3. The *Beechum* gloss on Fed.Rule of Evid. 404(b) states:

What the rule calls for is essentially a two-step test. First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403. 582 F.2d at 911. Thus, the admissibility requirements for intrinsic evidence and permissible extrinsic evidence are identical.

by a single Brotherhood member who testified in a quasi expert capacity. Although an additional six witnesses were questioned about their knowledge of the Aryan Brotherhood, each responded with barely a single sentence: they described the Brotherhood as a white supremacist organization, which had devolved from its original protectionist function, into a violent gang seeking to control prison drug traffic. Such description may have been damaging to the defense but it was not unfair. As we observed in *United States v. McRae,* 593 F.2d 700, 707 (5th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979):

> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.

(emphasis in original).

Mills strenuously maintains that at least one portion of the testimony introduced by the government squarely violates the Rule 403 proscription. The government called several witnesses to testify about their intense, deathly fear of the Aryan Brotherhood. With witness after witness, the government hammered away at the fright issue, asking detailed questions. One witness, an FBI agent, was called only to testify that the fear of another witness was not feigned. The witness had staged a phony suicide attempt, slashing his wrists and hanging himself, in order to be placed in the Witness Protection Program. The FBI agent described this witness as the most frightened person he had ever seen in his life. It is indisputable that this cumulative testimony of terror impacted upon the jurors, one of whom inquired about the possibility of a "juror protection program."

If such testimony had been introduced merely to bolster the prosecution's case-in-chief we might well find a Rule 403 viola-

tion sufficient to constitute reversible error, but this was not the situation. The core of Mills' defense was his attempt to impeach the credibility of the government witnesses by proving that they had agreed to testify falsely for the government to manipulate their way into the "country club" conditions of the Witness Protection Program. He persistently and consistently pursued this point in his cross-examination of every inmate witness testifying for the government. Consequently, the government's equally insistent efforts to maintain the credibility of its witnesses became essential to rebuttal of Mills' defense.

■ The challenged letter that was introduced into evidence was not Mills' handwritten original, but a copy made by prison officials at Marion, Illinois. Mills claims that under *Procunier v. Martinez,* 416 U.S. 396, 409, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974) a prisoner's reasonable expectation of privacy in his correspondence is subject only to the very limited intrusion required for prison officials to assure that the mail does not contain material in violation of prison regulations. He further contends that, while the censorship and seizure of the original letter was proper, making a duplicate copy was an unnecessary additional act unconstitutionally invading his right to privacy. Because the *Martinez* decision was based on the first amendment rights of nonprisoners to communicate with prisoners, it does not apply to the inmate to inmate correspondence at issue here.

■ A federal prisoner does not surrender his constitutional rights at the prison gates. *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974). Although the scope of a federal inmate's fourth amendment protection is not identical to that which he enjoys in his own home or on the streets, *Lanza v. New York,* 370 U.S. 139, 143–44, 82 S.Ct. 1218, 1220–21, 8 L.Ed.2d 384 (1962) "[i]n the prison context . . . the government always must show that a legitimate penological need necessitated the search, that

the need could not have been satisfied by a more narrow means, and the search and any consequent seizure were conducted in a reasonable manner" under the facts and circumstances. *United States v. Lilly,* 576 F.2d 1240, 1246 (5th Cir.1978) (citation omitted).

We are satisfied that this burden has been met. The challenged letter contained information on the activities of the Aryan Brotherhood, known to be a violent and dangerous organization within the federal prison system; it discussed criminal activities and possible perjured testimony to be offered by Aryan Brotherhood members and members of fellow gangs.[4] As part of their duty to maintain order and investigate crime within the prison, the prison officials who intercepted the letter would have been lawfully entitled to retain it. 28 C.F.R. § 540.12 (1982), dealing with notification of rejections of inmate correspondence, states in pertinent part:

> The Warden shall return rejected correspondence to the sender unless the correspondence includes plans for or discussion of commission of a crime or evidence of a crime, in which case there is no need to return the correspondence or give notice of the rejection, and the correspondence should be referred to appropriate law enforcement authorities.

The deliberate and slippery slang of Mills' letter, alluding to perjured testimony, falls within both the "commission of a crime" and "evidence of a crime" provisions of section 540.12. It is unclear from the record whether prison officials retained the original letter or only the copy. Had they retained the original they would, of course, have been fully within their rights in making a duplicate file copy. The same result follows if the prison officials took the more lenient route of returning the original to Mills. The officials still retained their professional responsibility to investigate the potential dangers to prison security discussed in the letter. As the Supreme Court stated in *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. at 132–33, 97 S.Ct. at 2541–42:

> Prison life, and relations between the inmates themselves and between the inmates and prison officials or staff, contain the ever-present potential for violent confrontation and conflagration. Responsible prison officials must be permitted to act ... before the time when they can compile a dossier on the eve of a riot.

If the prison official returned the original to Mills, his duties required that he either make detailed notes of the information in the letter, or duplicate it. We can find no difference of constitutional significance between the former, clearly legitimate alter-

---

4. The challenged letter states in pertinent part: [A]ll right Brother, how are ya doin'? As for me, all's the same old program, just in a different neighborhood. Presently, I'm doing a two-year program here at Marion in the Control Unit. Yeah, they gave me a couple bogus 187's down in Atlanta, nothing they've been able to take me to court on yet. I did just get thru with an assault trial at Leavenworth.... We fought it ourselves and ended up with a hung jury. So I'm now waiting to see if the U.S. Attorney that way is gonna file for a retrial.... A few of us have swore off burnt spoons this way.... We have a couple of new kids this way that we need to sit and rap about. We have asked that you fellas trust our judgment on new kids this way, as we trust your judgment that way. It's just that sending names thru the mail only puts the bottles on top of folks they need not be. Tommy and I will stand accountable for things this way and all will stay in top order. I understand that Arizona is sending about ten fellas this way that are claiming brand. Has anyone been able to get to the bottom of the story on that trip in Arizona? I've got a home-boy that way now and am attempting to find out how all that came about out that way. If I end up going to trial down in Atlanta, and it does look like I will be shortly, do you want me to call you? I called Baby out to my last trial at Leavenworth. What I'd like to do is call you, someone from the Bay, and someone from Palm Hall. I was thinking along the lines of you, Buff, and Rick. We do need to just sit and rap a spell. Let me know your thoughts on that.... Marion seems to be becoming home base for the M and us. About ten of them out this way. What's the story on things between them and us? I myself hope with all my heart things can be worked out with respect to all, as only the bottles can gain any other way. Keep us posted. Well, I'll hush my mouth for now and fold this on up. My love to kin and friends.

native and use of its functional equivalent, the photocopy machine.

 Evidence of the specific motive for the murder was provided by a former cellmate of the victim. The cellmate testified about an altercation between the victim and Tommy Silverstein, in which Silverstein accused Marzloff of having cheated him out of some dope and told him he would not get away with it. In addition, the former cellmate and a Leavenworth correctional officer both testified that, after Silverstein had read the newspaper report of Marzloff's death he made triumphant comments to another inmate to the effect of "we have got him" and "those punks will learn not to f\_\_\_ with us."

Mills contends that testimony about Silverstein was inadmissible hearsay. We disagree. The cellmate's testimony on the altercation between Marzloff and Silverstein was offered only to show that there had been a heated argument over drugs between Marzloff and Silverstein during which Silverstein expressed his feeling that he had been cheated. It was not offered for the truth of the matter asserted (that Marzloff had actually cheated Silverstein). No hearsay issue is raised by its admissibility. Fed.R.Evid. 801(c).[5]

Silverstein's statements subsequent to learning of Marzloff's death were admissible under Fed.R.Evid. 804(b)(3)[6] as statements against penal interest. Appellant argues that under the circumstance of one inmate bragging to another about crimes committed, the statement was not against penal interest at the time it was made, as required under Rule 804(b)(3). This argument is disingenuous. Silverstein shouted out his victory through the bars of his cell, in a voice audible throughout the area. He well understood the possibility that his statement might be overheard by prison guards, as in fact it was, and that penal consequences might result.

## V

### CHARACTER IN ISSUE

 Appellant claims that the district court erred in ruling that he had placed his character in issue and thus allowing the prosecution to introduce evidence of bad character. The ruling was made following Mills' cross-examination of Mr. Van Buskirk. Van Buskirk testified extensively on the nature, structure, organization and activities of the Aryan Brotherhood. During cross-examination Mills attempted to elicit testimony from Van Buskirk that Mills' character was not in keeping with membership in the Aryan Brotherhood. The exchange at issue is the following:

Q: I take it you know me personally?

A: Yes.

Q: Have I ever presented myself to you as a madman? Do I just run around wanting to kill everybody?

A: No, no.

Q: Have I presented myself to you as being basically fair and just towards everyone in a general way?

A: Yeah, I would say you have as far as I know.

Q: Isn't it a fact, Mr. Van Buskirk, that of your own personal knowledge, you have known me to stop more things, a tremendous amount of things, go out of my way to keep things in order to keep people from getting hurt?

A: I don't understand what you are talking about.

Q: Anytime there has been a misunderstanding that you have been aware of and I have become aware of it, have I tried to be basically fair and get to the root of it?

---

**5.** Fed.Rule of Evid. 801(c) states:

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

**6.** Fed.Rule of Evid. 804(b)(3) states in pertinent part:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.

A: Between us?

Q: Between us, dealing with you and I on a personal level.

A: We haven't had any problems when we were together that I know of, that I can remember.

By the plain language of his questions, Mills placed his character in issue, after which the prosecution was entitled to rebut with evidence of bad character, Rule 404, Notes of Advisory Committee on Proposed Rules (1982 ed.). As the former fifth circuit stated in *United States v. Hewitt*, 634 F.2d 277, 278 (5th Cir.1981):

Federal Rule of Evidence 404 codifies the familiar rules governing the use of character evidence in criminal and civil trials. In general, the prosecution may not present evidence of the bad character of the accused unless and until the accused presents evidence of good character. The accused may always introduce evidence of "pertinent" traits of his character, however, thereby opening the door to cross-examination and rebuttal on those traits. (citations omitted).

Mills argues that the testimony of Van Buskirk left him virtually cornered, and that his only options were to cross-examine the witness on his character or to forego cross-examination entirely. We need not speculate on the alternative tactics which Mills might have employed. It suffices to observe that evidence of character is a legitimate and powerful tool of the defense, which alone may be sufficient, in certain circumstances, to raise a reasonable doubt of defendant's guilt, *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), but which carries with it the corresponding danger that the prosecution may introduce more persuasive testimony of defendant's bad character. As the Supreme Court stated in *Michelson*, the classic case on use of character evidence:

The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. . . . Thus, while the law gives the defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

335 U.S. at 479, 69 S.Ct. at 220.

## VI

### THE IN–COURT IDENTIFICATION

■ Mills contends that the district court abused its discretion in failing to conduct an *in camera* hearing on the admissibility of an in-court identification. On the night following the murder, the witness had twice identified Mills, first in a photo array consisting of all the prison inmates and subsequently at a one-on-one show-up. At trial, Mills objected to the in-court identification as having been tainted by the pretrial identification procedures. On appeal he argues only that the court's failure to conduct an *in camera* hearing on the issue of taint violated his fifth amendment due process rights.

In *Watkins v. Sowders*, 449 U.S. 341, 348, 101 S.Ct. 654, 659, 66 L.Ed.2d 549 (1981) the Supreme Court held that the due process clause of the fourteenth amendment does not require a *per se* rule that an *in camera* hearing be conducted whenever a defendant challenges the admissibility of a witness' identification. The Court reasoned that it is the "reliability of identification evidence that primarily determines its admissibility" and that it is the particular function of the jury to evaluate the reliability of witness' testimony. *Id.* 101 S.Ct. at 658. The Court concluded that due process does not require "the abandonment of the time-honored process of cross-examination as the device best suited to determine the trustworthiness of testimonial evidence." *Id.* at 659. The *Watkins* rationale equally applies to a fifth amendment due process claim.

Despite the absence of a *per se* rule, an *in camera* hearing may be constitutionally required in some circumstances. *Watkins v. Sowders*, 449 U.S. at 348, 101 S.Ct. at 659;

*Holifield v. Davis,* 662 F.2d 710, 711 (11th Cir.), *cert. denied,* 455 U.S. 1026, 102 S.Ct. 1730, 72 L.Ed.2d 147 (1981). Mills has alleged no such unusual, special, out of the ordinary, or particularly prejudicial circumstances. The determination of whether to conduct an *in camera* hearing, therefore, rests in the sound discretion of the trial judge. *Holifield v. Davis,* 662 F.2d at 711; *United States v. Smith,* 546 F.2d 1275, 1279 (5th Cir.1977).

■ We can find no fault with the procedure used by the district court. At trial, when defendant requested an *in camera* hearing on the admissibility issue, government counsel stated that he would, through his direct examination, lay a foundation for an independent basis of identification. He also stated that he was uncertain as to whether the witness would be able to identify the defendant in court as his appearance had changed substantially from the date of the crime. Prior to the in-court identification the prosecution elicited testimony that the witness had been a fellow inmate of the defendant's for approximately five weeks prior to the crime. He had seen Mills almost daily and was familiar with his friends but had never spoken with him and did not know his name. On the day of the murder, the witness had seen the defendant both entering and leaving the recreation shack where the murder was committed. He saw Mills in the bright summer sunlight of the prison yard, while the witness, an outsider to the crime, was enjoying his Sunday recreational time. Such a substantial independent basis for identification renders an in-court identification admissible, despite the existence of other impermissibly suggestive identifications intervening between the identification at the time of the crime and the identification made in the courtroom. *Gilbert v. California,* 388 U.S. 263, 275, 87 S.Ct. 1951, 1957, 18 L.Ed.2d 1178 (1967); *United States v. Wade,* 388 U.S. 218, 241, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967). This substantial basis for an independent identification was laid before any testimony connecting the person whom the witness had seen with the in-court defendant. The procedure employed by the district court enabled the court to make a satisfactory determination on the admissibility of the in-court identification without undue prejudice to the defendant. The failure to conduct an *in camera* inquiry, under the circumstances of this case, did not constitute an abuse of discretion.

## VII

### KNOWING USE OF PERJURED TESTIMONY

■ Much of the outcome of the trial depended on the credibility attached to the testimony of Danny Holliday. Holliday, who also was armed with a knife, had accompanied Mills to the recreation shack. Having plea bargained to a lesser charge, Holliday testified that he had conspired with Mills only to rob Marzloff and took no part in the murder. The record is clear that only one knife was used to murder Marzloff.

During closing argument counsel for the prosecution argued with refreshing candor that the jury should not accept Holliday's testimony uncritically:

So, the conspiracy was set in motion. What is the first thing that must be done? The victim must be set up, and this is where Ernest Danny Holliday comes in. Ladies and gentlemen of the jury, going back to what I said about you can accept in whole or in part any witness' testimony. Danny Holliday obviously is someone that could be lying. That is something you must decide as every inmate in this case could be lying. Common sense tells you inmates lie. Therefore, you must be very careful in examining their testimony, extremely careful, especially when it is someone like Mr. Holliday and therefore, the Government tells you do not accept everything that Mr. Holliday says. In fact, if you don't believe it, reject it all.

The Government submits that the only thing that you can afford to believe on someone like this is that which you can corroborate, and the Government submits

that is all you should believe, only that which you can corroborate. If you can't corroborate it, he is inherently untrustworthy. Why? Because he was in on it. Because he was with these people. Using your common sense, if you are with someone and you want to cut a deal, if you are going to lie, you are going to lie about your own participation.

Do you really believe the Government has been conned by this man and that we have accepted his testimony in whole? The Government tells you don't accept it in whole. Only accept what you can corroborate.

■ Mills now contends that this statement was an admission by the government that Holliday's testimony was perjured, and that Mills' due process rights were violated by this knowing offer of perjured testimony. For the prosecution to offer testimony into evidence, knowing it or believing it to be false is a violation of the defendant's due process rights, *United States v. Sutherland,* 656 F.2d 1181, 1203 (5th Cir.), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1981); *United States v. Brown,* 634 F.2d 819, 827 (5th Cir.1981).

In this situation we do not agree that counsel's statement is an admission of knowledge that Holliday's testimony was false. We can only guess at the strategy beneath the rhetoric. Perhaps, by subtle means, he sought to emphasize the great degree to which the testimony of the chief government witness was corroborated on the crucial factual issues. Perhaps he sought to expose the genuine predicament resulting from the government's necessary reliance on the testimony of confessed co-conspirators and self-seeking prisoners.

In its brief, the government advances a forthright, pragmatic explanation. "The Government was placed in a quandary in deciding how to prosecute Mills. Without testimony from Holliday, Mills might be acquitted. On the other hand, if Holliday were used as a witness, the Government might unwittingly be bargaining with Marzloff's actual killer." If the government tried Holliday and Mills together, Holliday's postconspiracy admissions would be inadmissible in a joint trial. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). During a separate trial of Mills, if Holliday refused to testify for the United States, Holliday's statements against penal interest could not be used to inculpate Mills. *United States v. Sarmiento-Perez,* 633 F.2d 1092 (5th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 77, 74 L.Ed.2d 75 (1982). Therefore "[T]he government opted for a compromise by allowing Holliday to plead to a lesser charge in exchange for his testimony and by agreeing to place him in the witness protection program."

We find no fault with the government's candor or with its offering of Holliday's testimony. There was no due process violation.

## VIII

### THE *PINKERTON* CHARGE

■ The court instructed the jury on the so-called *Pinkerton* charge: that Mills could be found guilty of the substantive act of murder if the jury found that Mills was a member of a conspiracy to kill Marzloff at the time of the murder and that the murder was committed pursuant to a conspiracy of which Mills was a member.[7] *See Pinkerton*

---

7. The *Pinkerton* charge given to jury was:

Ladies and gentlemen, if you find that the defendant is guilty of conspiracy as charged in Count I, you may also find the defendant guilty of the substantive offense as charged in Count II of the indictment; that is, murder, provided that you find that the essential elements of that count as defined in these instructions have been established beyond a reasonable doubt, and provided that you also find beyond a reasonable doubt first that the

offense of murder was committed pursuant to the conspiracy; and, second, that the defendant was a member of the conspiracy at the time the murder was committed.

Under the conditions just defined, the defendant may be found guilty of murder even though he did not participate in the acts constituting that offense. The reason for this is that a co-conspirator committing a substantive offense pursuant to a conspiracy is held to be the agent of the other conspirators.

*v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

Mills claims that insufficient evidence was produced of Holliday's membership in the alleged conspiracy to warrant the *Pinkerton* instruction. He contends that the government's evidence showed only that Holliday and Mills were together in the recreation shack at the time of the murder, an insufficient basis for the inference of a common plan or goal.

 It is true that the prosecution must offer some evidence showing that the coconspirator knowingly joined with others to accomplish an illegal purpose, *United States v. Ballard,* 663 F.2d 534, 542–43 (5th Cir. 1981); *United States v. Middlebrooks,* 618 F.2d 273, 278 (5th Cir.), *cert. denied,* 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 247 (1980), and that the conspirator knew the essentials of the conspiracy. *United States v. Ballard,* 663 F.2d at 543; *United States v. Alvarez,* 625 F.2d 1196, 1198 (5th Cir. 1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981). Ample evidence apart from Holliday's testimony was adduced at trial to show the existence of the contract-murder conspiracy against Marzloff as an aspect of the broader Aryan Brotherhood conspiracy to control drug transactions in the federal penitentiaries. Within this context, the circumstantial evidence of Holliday's behavior is sufficient to show his agreement and participation. "A person's acts can create an inference concerning what he has agreed to do and, therefore, an agreement to join a criminal conspiracy may be inferred from the performance of acts that further its purpose." *United States v. Welch,* 656 F.2d 1039, 1056 (5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982). *Accord United States v. Smith,* 700 F.2d 627, 632

(11th Cir.1983) ("The existence of an agreement and the cooperation of the defendant may be proved by circumstantial evidence"); *United States v. Lee,* 694 F.2d 649, 652 (11th Cir.1983). Similarly, "A defendant's knowing participation in a conspiracy may be established through proof of surrounding circumstances, such as acts . . . which furthered the purpose of the conspiracy," *United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir.1983). Holliday testified that he had agreed to and did accompany Mills to the recreation shack to commit a crime against Marzloff and that he and Mills made advance plans for the commission of this crime. He wore a green fatigue jacket despite the summer heat; was armed with a deadly weapon; and gave precise details of the crime, corroborated by an investigative team, which only an eyewitness would have known. When this evidence is viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and all reasonable inferences and credibility choices are read in support of the jury's finding, *United States v. Aguiar,* 610 F.2d 1296, 1303 (5th Cir.), *cert. denied,* 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 31 (1980), the evidence is amply sufficient to support a finding of Holliday's participation in the conspiracy and, therefore, to support the *Pinkerton* jury charge.[8]

The judgment of the district court is AFFIRMED.

---

Accordingly, if you find that Defendant Mills was a member of a conspiracy to kill John Sherman Marzloff at the time the murder of Marzloff was committed, and if you find that the murder of Marzloff was committed pursuant to the conspiracy of which Mills was a member, then you may find the defendant guilty of murder of Marzloff whether or not Mills actually committed the murder himself.

**8.** Appellant also argues that the trial court erred in giving midtrial instructions over his objection, that the prosecutor's closing argument was plain error, that the trial was fundamentally unfair, and that the sentence imposed was illegal. We find these claims to be similarly without merit.