838 F.2d 468
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ralph JACKSON, Jr., Defendant-Appellant.
 No. 87-5575.
 United States Court of Appeals, Fourth Circuit.
 Argued; Dec. 4, 1987.
Decided: Jan. 15, 1988.
 
 Edwin Arnold Williams (Kellogg, Williams & Lyons, on brief), for appellant.
 Leslie Anne Hulse, Special Assistant, United States Attorney (Henry E. Hudson, United States Attorney, on brief), for appellee.
 Before CHAPMAN and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Ralph Jackson challenges his convictions for armed bank robbery and use of a firearm in the commission of a violent felony. Jackson claims that the admission of an eyewitness' identification of him violated his right to due process, and that the trial court erred in not holding a hearing on the admissibility of the identification before it was presented to the jury. Finding no merit in these contentions, we affirm.
 
 I.
 
 2
 On September 23, 1985, three armed men robbed the Central Fidelity Bank in Falls Church, Virginia, of approximately $29,000. Two of the robbers wore masks, and one wore a motorcycle helmet. The robbers dragged one teller through the bank by her hair, slapped another, and stomped on a third teller's hand as she lay facedown on the floor. They then cleared the money out of the tellers' drawers and placed it in a gym bag. In the process they unwittingly took a bundle of money rigged to explode with tear gas and red dye on being taken out of the bank.
 
 
 3
 During the robbery, Mrs. Patricia Fiedler was sitting in her pickup truck in the parking lot adjacent to the bank, resting with her eyes closed because she did not feel well. She opened her eyes on hearing the sound of footsteps and saw the three robbers run to their getaway car, which was parked right beside her. Mrs. Fiedler was struck by the fact that one of the men was wearing pink rubber gloves, but "kind of closed her eyes" again, thinking that the men might be a cleaning crew.
 
 
 4
 At this point, however, one of the robbers said "this thing is starting to blow," and red smoke began billowing from the getaway car. Realizing that these men must have robbed a bank, Mrs. Fiedler turned her attention to the scene, which she found "exciting," having "never seen anything like that before." Red smoke began to drift into Mrs. Fiedler's window, and she hung her head outside to get some fresh air. As she did, she observed the robber with the smoking gym bag only a door's width away from her. She had a clear view of the robber's profile from an angle "slightly behind him to his right."
 
 
 5
 Two of the robbers got out of the car, and one began to beat the smoking bag against the pavement in an attempt to put it out. Fearing that the robbers might be dangerous, Mrs. Fiedler rolled up her window. She continued to watch, however, and got a second look at the robber with the bag, this time from an angle "slightly to the left and behind." The robber in the driver's seat then started the car and began to drive off. Mrs. Fiedler memorized the license number as the car pulled away.
 
 
 6
 After the police and FBI agents arrived, Mrs. Fiedler gave them the license number of the car, which was traced to the girlfriend of Jackson's codefendant in the robbery. The motorcycle helmet worn by one of the robbers was also recovered at the scene, and Jackson's fingerprint was later found on it. Mrs. Fiedler gave the officers a description of one of the robbers, whom she had seen full face. She did not, however, give a description of the man with the bag, because the other man had "made more of an impression" on her.
 
 
 7
 Approximately one year after the robbery, Mrs. Fiedler met with an FBI agent to review some photographs of suspects. She reviewed two sets of photographs, which included photos of Jackson and his codefendant. She did not identify them. She later explained her inability to identify Jackson by saying that the photos were full face, while she had seen Jackson only in half-profile.
 
 
 8
 On the morning of Jackson's first trial, March 10, 1987, Mrs. Fiedler arrived at the courthouse expecting not to be able to identify any of the robbers. One of the prosecutors told Mrs. Fiedler that if she recognized anyone in the courtroom she should notify a Marshal or FBI agent. As she walked through the door, however, Mrs. Fiedler saw Jackson's profile at exactly the same angle from which she had seen the robber's profile. She described her recognition of Jackson by saying that seeing him "knocked the wind out of me." Mrs. Fiedler was not asked to identify Jackson at the first trial, and she did not tell anyone that she had recognized him until after the court recessed for lunch. Mrs. Fiedler explained this by saying that she was unsure who to tell or what to do because the judge had admonished the witnesses not to say anything about the case. Mrs. Fiedler debated whether to tell anyone that she had recognized Jackson as the man with the bag, and finally told one of the prosecutor's assistants that she "recognized the man in the pink shirt as the man with the money."
 
 
 9
 The assistant showed little reaction to Mrs. Fiedler's statement, and after returning home Mrs. Fiedler was uncertain whether she should contact the prosecutor again. She spoke to members of the prosecutor's office several times during this period, but did not mention the identification. After consulting with family, friends, and her pastor, however, she called and told the prosecutor that she had recognized Jackson. The prosecutor arranged for Mrs. Fiedler to testify as to Jackson's identity at his second trial, after the jury hung at Jackson's first trial.
 
 
 10
 Jackson's counsel moved to have the identification excluded and to have a hearing on its admissibility outside the presence of the jury. These motions were denied on the ground that any objections to the identification went to its weight, not admissibility. Mrs. Fiedler positively identified Jackson as the robber with the smoking bag. Defense counsel fully cross-examined Mrs. Fiedler on all aspects of her testimony, including her limited view of the robber with the bag, her failure to give a description at the scene, her failure to identify Jackson's photo, and the length of time that had passed between the robbery and her identification. After hearing the evidence, the jury found Jackson guilty of armed bank robbery in violation of 18 U.S.C. Sec. 2113(a), (d), and use of a firearm in commission of a felony, 18 U.S.C. Sec. 924(c).
 
 II.
 
 11
 The Supreme Court has made clear that review of the admission of identification evidence under the due process clause is based on the reliability of the identification, judged in the totality of the circumstances. Manson v. Braithwaite, 432 U.S. 98 (1977). Even where the confrontation that produced the identification was unnecessarily suggestive, the identification may still be admissible if the totality of the circumstances does not reveal a "very substantial likelihood of misidentification." Neil v. Biggers, 409 U.S. 188 (1972). In analyzing the totality of the circumstances, the factors to be considered
 
 
 12
 include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effects of the suggestive evidence itself.
 
 
 13
 Braithwaite, 432 U.S. at 114. We therefore consider these factors as they apply to the facts of this case.
 
 
 14
 First, Mrs. Fiedler had a clear opportunity to view the robbers at the time of the crime. The robbery occurred on a clear day and Mrs. Fiedler's view was unobstructed. The robber with the bag was only a few feet away, and Mrs. Fiedler had two separate opportunities to view him. It is true that she saw the robber only in profile. As to this point, however, we find very telling that Mrs. Fiedler was consistent in her refusal to make any identification until she saw Jackson from that very same angle.
 
 
 15
 As to the second factor, Mrs. Fiedler's attentiveness, we again find strong indicia of reliability. Although Mrs. Fiedler initially paid little attention to the robbers as they left the bank, the commotion that began once the smoke bomb ignited would undeniably have riveted her attention to the scene. There can be no question that Mrs. Fiedler was an unusually observant witness, as she quickly memorized the license plate of the getaway car and related it to the police when they arrived. Mrs. Fiedler's powers of observation and recall proved sound when the car with the license number she gave was found to contain red dye from the exploding packet taken in the robbery.
 
 
 16
 The third factor, the accuracy of the prior description, obviously is not an indication of reliability on these facts because Mrs. Fiedler gave no description of Jackson. We do not find this fact or Mrs. Fiedler's failure to identify the full face photo of Jackson to reveal a danger of unreliability, however. Mrs. Fiedler explained that she described only the robber whom she had seen full face because he made a stronger impression on her. Likewise, we find credible her explanation that she could not identify a full face photograph of Jackson because she had seen the robber with the bag at a different angle.
 
 
 17
 Mrs. Fiedler's level of certainty at the time of the confrontation, which is the fourth factor to be addressed, provides a strong indication that her testimony was reliable. When she finally saw Jackson from the same angle as her view at the crime scene, the force of the recognition "knocked the wind" out of her. Jackson argues that Mrs. Fiedler's hesitation in revealing her recognition of him reveals uncertainty. On the contrary, although Mrs. Fiedler may have been confused as to how she should go about revealing her knowledge, she expressed no uncertainty about the content of that knowledge. Mrs. Fiedler gave full consideration to the proper course that she should take, consulting her family, friends, and pastor. This behavior is indicative not of an uncertain mind, but of a conscientious and reliable witness to a frightening event. Mrs. Fiedler showed the degree of her certainty under extensive cross-examination, stating that she was "very sure" of her identification, and her identification of Jackson remained unqualified from the time it was first made.
 
 
 18
 As to the passage of time, in the totality of the circumstances we are unwilling to say that seventeen months between the robbery and Mrs. Fiedler's recognition creates such a risk of unreliability as to preclude admission. Mrs. Fiedler had made no previous identifications that threatened to influence her on seeing Jackson at the courthouse. Cf. Biggers, 409 U.S. at 201. Although the delay was substantial, its significance was nonetheless a proper matter for the jury to consider.
 
 
 19
 Further, the possible "corrupting influence" of an initial suggestive identification, which is to be weighed against its reliability, hardly calls for exclusion here. This case does not involve the type of inherently unfair and suggestive police procedures that the protections of due process are intended to forestall. Mrs. Fiedler's recognition of Jackson was essentially spontaneous. Although the identification did take place in court while Jackson was at the defense table, Mrs. Fiedler was under no pressure to make an identification; indeed, no one expected her to do so. Thus, while the totality of the circumstances may allow admission even of an identification produced by "suggestive and unnecessary" police techniques, Braithwaite, supra, the identification here was not of that sort.
 
 
 20
 A final, and significant, consideration is the fact that Jackson's attorney had a full opportunity to cross-examine Mrs. Fiedler about the reliability of her identification. She was questioned at length about her opportunity to view Jackson, her failure to describe her or identify his photograph, the passage of time, and so on. These matters were fully aired before the jury. As the Supreme Court has stated: "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." Braithwaite, 432 U.S. at 116. Under the circumstances of this case we do not find a very substantial likelihood of irreparable misidentification. "Short of that point, such evidence is for the jury to weigh." Id.
 
 III.
 
 21
 Jackson's other contention is that the district court's refusal to conduct a hearing on the admissibility of the identification outside the presence of the jury was itself a constitutional error requiring reversal. We disagree.
 
 
 22
 The Supreme Court has held that due process does not require a hearing outside the presence of the jury whenever a defendant attacks the reliability of an identification. Watkins v. Sowders, 449 U.S. 341 (1981). The court contrasted the admissibility of identification testimony with that of confessions. A hearing is required as to the voluntariness of a confession because the jury may be unable to appreciate the fact that an involuntary confession, though perhaps reliable, must not be considered simply because of society's aversion to coerced confessions. See Jackson v. Denno, 378 U.S. 368 (1967). It is reliability itself that determines the admissibility of identification evidence, however, and determination of reliability is the "very task our system must assume that juries can perform." Watkins, 449 U.S. at 347.
 
 
 23
 The Watkins Court did state in "some circumstances" a hearing "may be constitutionally necessary." Id. at 349. These circumstances have been described by one court--albeit in the course of refusing to require a hearing--as "unusual, special, out of the ordinary, or particularly prejudicial circumstances." United States v. Mills, 704 F.2d 1553, 1565 (11th Cir.1983). It is anything but apparent, however, what facts might on review constitute a case so unusual or prejudicial as to require a hearing, but which would not suffice to require exclusion of the testimony outright.
 
 
 24
 Watkins leaves the decision whether to hold a hearing outside the presence of a jury in a case such as this to the discretion of the trial court. See Mills, 704 F.2d at 1565. We can find no abuse of discretion in the district court's handling of Jackson's objection to Mrs. Fiedler's testimony. The district judge heard a full explanation of Jackson's objections to the testimony before the jury was impaneled, and clearly stated that if the facts were as Jackson claimed, he wold nonetheless allow the identification to go to the jury. Under these circumstances, a hearing on the matter would likely have served no purpose, and the absence of such a hearing provides no basis for a reversal of Jackson's conviction.
 
 
 25
 AFFIRMED.