Omar BLANCO, Petitioner,

v.

Richard DUGGER, Respondent.

No. 87–6685–Civ.

United States District Court,
S.D. Florida.

July 11, 1988.

Mark E. Olive, Chief Asst., Capital Collateral Representative, Tallahassee, Fla., for petitioner.

Carolyn V. McCann, Asst. Atty. Gen., West Palm Beach, Fla., for respondent.

REVISED MEMORANDUM OPINION AND ORDER DENYING IN PART AND GRANTING IN PART PETITION FOR WRIT OF HABEAS CORPUS[1]

HASTINGS, District Judge.

THIS CAUSE comes before the Court upon Petitioner Omar Blanco's Petition for Writ of Habeas Corpus. After granting a stay of execution to review the claims set forth herein, presiding over an evidentiary hearing, a careful consideration of all materials submitted along with the record, and being fully advised, this Court's opinion and order are set forth below.

PROCEDURAL HISTORY

Petitioner Omar Blanco, (hereinafter referred to as "Blanco"), was tried by a jury and convicted on June 11, 1982 of first degree murder and burglary while armed with a handgun. On June 21, 1982, Blanco was sentenced to death by electrocution on the first degree murder conviction and to a consecutive sentence of seventy-five (75) years with a mandatory minimum of three (3) years imprisonment on the armed burglary conviction.

Blanco directly appealed his conviction to the Supreme Court of Florida, raising nine (9) issues, several of which are reasserted here. The Florida Supreme Court affirmed the conviction and sentences. *Blanco v. State,* 452 So.2d 520 (Fla.1984), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 953 (1985) (hereinafter referred to as *"Blanco I "*). (A full description of the facts regarding this crime are set forth in

*Blanco I,* 452 So.2d at 522–23 and are adopted by this Court for the purposes of this opinion.) On January 7, 1986, the Governor of Florida signed a death warrant for Blanco. On January 31, 1986, Blanco filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, raising eleven claims. The trial court entered a stay of execution on February 3, 1986. On that same date, Blanco also filed a state court petition for writ of habeas corpus in the Supreme Court of Florida, raising only two claims, both of which included many of the sub-issues asserted here.

After an evidentiary hearing, the trial court denied the motion for post-conviction relief on April 21, 1986 and Blanco appealed to the Supreme Court of Florida. On May 7, 1987, the Supreme Court of Florida affirmed the trial court's denial of the 3.850 motion and denied habeas corpus relief. *Blanco v. Wainwright,* 507 So.2d 1377 (Fla.1987), *reh'g denied* (July 10, 1987) (hereinafter referred to as *"Blanco II "*).

The Governor signed a second death warrant for Blanco on August 18, 1987 with the execution date set for September 17, 1987. Blanco filed a Petition for Writ of Habeas Corpus in this Court on September 16, 1987 at 2:33 P.M. This Court, after reviewing the record and presiding over oral argument on Blanco's motion to stay execution, granted a stay. An evidentiary hearing was held on January 4 and 5, 1988, where counsel were ordered to present evidence on several claims and oral argument or additional briefs on others.

After a careful review of the record and being fully advised, this Court has examined at length the merits of all fifteen claims asserted by Blanco and its findings are set forth below.

---

1. This Court issued its first memorandum opinion and order concerning this matter on April 27, 1988. On May 16, 1988, this Court granted Respondent's motion for reconsideration of that order. Both parties have now provided this Court with additional pleadings and authorities

which have greatly assisted in clarifying the issues. The following is the Court's revised order in light of these pleadings. Any argument raised on reconsideration, but not expressly treated in this revised opinion has been con-

## INDIVIDUAL CLAIMS [2]

CLAIM I: PRE–TRIAL IDENTIFICATION PROCEDURES

### A. *Lineup: Identification Testimony of Thalia Vezos*

Blanco was identified by Thalia Vezos as the person who shot and killed the victim. Vezos, a fourteen year old girl, was in the house when her uncle, the victim, was shot. In analyzing challenged identifications,

> [t]his circuit has adopted a two-step analysis for determining whether identifications based on a lineup or photo array are so unreliable as to violate due process. We must first decide whether the original identification procedure was unduly suggestive. If not, that ends the inquiry. If so, however, we must then determine whether the suggestive procedure, given the totality of the circumstances, created a substantial risk of irreparable misidentification at trial.

*Williams v. Weldon,* 826 F.2d 1018, 1021 (11th Cir.1987). "Reliability is the linchpin in determining the admissibility of identification testimony." *Williams,* 826 F.2d at 1021, citing *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

■ Here, Ms. Vezos identified Blanco in a lineup conducted only one day after the murder. (T. 91–92). A police detective cautioned Ms. Vezos to view the entire lineup before making her decision (T. 101–102). After viewing all the lineup participants, she then positively identified Blanco as the person who shot her uncle (T. 102). While Blanco and the other four lineup subjects were approximately the same height, Blanco claims that his facial hair and manner of dress differentiated him from the others.

This Court has examined the photographs of the lineup viewed by Ms. Vezos and agrees with the trial court that Blanco's appearance was in no manner substantially distinguishable from the others to render the procedure impermissibly suggestive. Accordingly, the lineup did not violate due process under the test of *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), which requires that "the conduct of identification procedures ... [not] be ... 'unnecessarily suggestive and conducive to irreparable mistaken identification.' " *Foster,* 394 U.S. at 442, 89 S.Ct. at 1128.[3]

■ Blanco also contends that a full record of this issue was not developed at trial, thereby precluding an informed and reasoned decision regarding the constitutionality of the lineup. This Court disagrees. The record is replete with evidence and testimony regarding the identification procedures (T. 90–92; 101–102; 158–159; 898–900). Additionally, this Court has independently reviewed the lineup photographs and has determined that the standard enunciated by the United States Supreme Court in *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) has been met. That standard is, that the trial court's findings are "fairly supported by the record." Therefore "the presumption of correctness ... control[s]." *Sumner,* 455 U.S. at 593, 102 S.Ct. at 1305.[4]

### B. *Show Up: Identification Testimony of George Abdeni*

Mr. George G. Abdeni, the victim's neighbor, immediately after the murder, ob-

---

sidered by this Court and is denied on the merits.

**2.** The claims as addressed in this opinion are not presented in the same order as raised by Blanco in his petition.

**3.** In the *Williams* case, the petitioner was the only black man in the lineup, but the Eleventh Circuit Court of Appeals found that "the other members of the group all had similar skin tone and facial characteristics.... [and] [t]he group was similar in appearance to the generally consistent descriptions of the robber given by the ... witnesses." *Williams,* 826 F.2d at 1021.

**4.** On reconsideration, Blanco also suggests that this Court conduct an evidentiary hearing on this issue. This Court has already conducted one hearing at which Petitioner was invited to submit additional support or argument on this claim. Blanco failed at that time to produce any evidence on this issue and elected instead to submit the issue to this Court in a brief. Thus, Blanco cannot now be heard to complain regarding the procedure this Court utilized to review this claim.

served a "form dressed in a sort of a grayish jogging suit pass by in front of the house on the lawn, not on the street, and go towards bayview" (T. 794). Pursuant to the description given by Abdeni and Vezos, a "Be On the Lookout" (BOLO) police order was issued throughout the area. The BOLO described the suspect as follows:

1. Race and sex: Latin male
2. Height: 5'10"
3. Hair: Black and curly
4. Complexion: Dark
5. Facial Hair: Moustache
6. Clothing: Gray or light-green sweatsuit
7. Location: Last seen running in an easterly direction

(T 814).

Blanco was seen near the victim's home and stopped by a police officer, Officer Price (T. 813–836). Officer Price determined that Blanco fit a majority of the seven part BOLO (T. 816). On this basis, Officer Price correctly determined that he had probable cause, arrested Blanco, and then brought him to the scene of the crime. The police presented Blanco to Abdeni to determine if Blanco was the person who Abdeni had seen (T. 820). Although Abdeni had difficulty ascertaining whether the form he described was that of a woman or a man, he immediately identified Blanco as the person he had spotted leaving the victim's house (T. 805).

The seminal case regarding the constitutionality of show-ups is *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The *Neil v. Biggers* standard was recently reiterated in *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir.1987):

Factors considered in determining reliability include "the opportunity to view the witness at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

In essence, the test probes the reliability of the identification.

■ Although a show-up was arguably not the best method to conduct an identification, the "totality of the circumstances" demonstrates that the police "did not aggravate the suggestiveness" of the show-up, and therefore, "the confrontation was not impermissible." *Johnson*, 817 F.2d at 729; See also *Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977). Here, the record establishes that Abdeni had sufficient opportunity to observe the person leaving the premises to give a description of the suspect's form and clothing (T. 66–67; 795). Moreover, Abdeni told the police and later, the jury, that he could only recognize the suspect's body form and type of clothing and that Blanco fit both criteria (T. 72–76; 803–809).

Additionally, the jury heard all the evidence and was given the opportunity to disregard that identification or assign less credibility to Abdeni's testimony. The record belies Blanco's argument that trial counsel failed to develop inconsistencies in Abdeni's testimony (T. 799–808; 810–812). Contrary to Blanco's assertion, on cross-examination, defense counsel, Mr. Tenbrook, brought the discrepencies in the identification to the jury's attention, including Abdeni's inability to observe the suspect's head through the trees in front of the victim's house, Abdeni's uncertainty as to the sex of the person, and the overall vagueness of the description (T. 799–808; 810–812).

[S]uch evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

*Manson*, 432 U.S. at 116, 97 S.Ct. at 2254. Thus, based upon the totality of circumstances in this case, there was no error in admitting this identification testimony.

Based upon the aforementioned findings, Blanco's challenge to the identification testimony of Vezos and Abdeni must be DENIED.

CLAIMS II, III AND IV: AGGRAVATING CIRCUMSTANCES

A. *Introduction*

Here, three (3) aggravating circumstances regarding the death sentence are at issue:

1. Premeditation;
2. Prior conviction; and
3. Felony murder.

The Supreme Court of Florida has found that, "[when] ... there are one or more valid aggravating factors that support a death sentence and no mitigating circumstances to weigh against the aggravating factors, death is presumed to be the appropriate penalty." *Blanco I*, 452 So.2d at 526. Therefore, should this Court find that there is even one valid aggravating circumstance and no mitigating circumstances, no relief from the death sentence as a result of the impermissible use of an aggravating circumstance can be obtained.

The three aggravating circumstances are discussed below *seriatim*.

CLAIM II: PREMEDITATION

Blanco not only questions whether the factor of premeditation could have been considered in determining his death penalty, he also questions whether it was even used by the trial court. Blanco's uncertainty is understandable. In its opinion on Blanco's direct appeal, the Supreme Court of Florida made, what appear to be contradictory statements regarding the issue of premeditation. On the one hand, the Court expressly held that the premeditation factor was "erroneously applied" because "there was no showing of heightened premeditation." *Blanco I*, 452 So.2d at 526. However, the Court also stated that, "[Blanco] was indicted for premeditated murder, the jury was instructed on premeditated murder, and the evidence supported premeditated murder." *Blanco I*, 452 So. 2d at 525. This confusion is explained below.

In essence, it appears that, as the Supreme Court of Florida interprets this state's death penalty statute, there is a distinction between simple "premeditation" and "heightened premeditation." Here the

Court found the existence of the former, but not the latter.

■ Presuming the aforementioned, mere "premeditation" cannot be used as an aggravating factor when considering the imposition of a death sentence. In *Nibert v. State of Florida*, 508 So.2d 1 (Fla.1987), the Court stated:

> We have consistently held that application of this aggravating factor required a finding of *heightened* premeditation; i.e., a cold-blooded intent to kill that is more than contemplative, more methodical, more controlled than that necessary to sustain a conviction for first-degree murder.

*Nibert*, 508 So.2d at 4.

Accordingly, inasmuch as the Supreme Court found no "heightened premeditation," the "premeditation" factor cannot be used in reviewing the criteria to support Blanco's death sentence.

The Florida Supreme Court's interpretation regarding premeditation as an aggravating circumstance was correct. The crime, although horrible as is any murder, does not meet the definition of heightened premeditation established by the Florida courts. The controlling statute delineating the level of premeditation is Fla.Stat. Section 921.141(5)(i). As quoted in *Nibert*, "[t]his aggravating circumstance has been found when the facts show a *particularly lengthy, methodic, or involved series of atrocious events or a substantial period of reflection and thought by the perpetrator*." *Nibert*, 508 So.2d at 4. The record establishes that, in this case, there were no such "atrocious" events or "substantial periods of reflection."

■ Thus, the only certainty regarding premeditation is that it was not a factor which could have been used as an aggravating circumstance for imposing the death penalty upon Blanco. However, as Respondent correctly contends, the Florida Supreme Court's opinion permissably found that although premeditation was *not* an aggravating circumstance, it could and did find that this murder was "premeditated" for purposes of determining guilt. This

Court agrees with Respondent that Florida law allows that the "level of premeditation" necessary to convict in the guilt phase of a first degree murder trial need not rise to the "level of premeditation" required to find an aggravating circumstance. *Preston v. State*, 444 So.2d 939 (Fla.1984); *Nibert*, 508 So.2d 1. Thus, the Supreme Court's opinion, while not completely clear on this matter, did find premeditation in this last regard. Here too, its decision was correct. Despite Petitioner's protestations to the contrary, viewing the evidence in the light most favorable to the verdict winner, the essential elements of a standard premeditated murder were proven, and done so beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Accordingly, premeditation as an aggravating circumstance is not a proper consideration here, but under Florida law, could and was found to be the basis of the verdict of guilt.

## CLAIM III: PREVIOUS CONVICTION

■ The trial court considered Blanco's previous conviction for armed *robbery* as an aggravating circumstance supporting the imposition of the death penalty (T. 1856). A second conviction for armed *burglary*, contrary to the respondent's contention, was not utilized.[5] The trial court stated,

> [t]hat at the time of the crime for which [Blanco] is to be sentenced, [Blanco] had been previously convicted of another capital offense, or of a felony involving the use of violence to some other person. This aggravating circumstance does apply in this case. The defendant, Omar Blanco, was previously convicted of an armed *robbery*.

. . . .

> The defendant, Omar Blanco, was also previously convicted of another crime, an armed *burglary* at the same time he was convicted of the armed *robbery*, however, the Court will not consider the armed *burglary* in this instance as another felony involving the use of violence to some person.

(T. 1856) (emphasis added).

On the date Blanco was sentenced to death, June 21, 1982, Blanco was appealing his conviction for the prior armed robbery which was considered by the trial court as an aggravating factor. On August 11, 1983, the Fourth District Court of Appeal for the State of Florida reversed the trial judges' denial of the motion to suppress and with it, reversed Blanco's previous conviction for armed robbery on Fourth Amendment grounds. *Blanco v. State of Florida*, 438 So.2d 404, 405 (Fla. 4th DCA 1983). That conviction was subsequently reaffirmed upon retrial on March 14, 1984. The Supreme Court of Florida then affirmed Blanco's death sentence on June 7, 1984.

Blanco contends that the prior conviction could not properly be considered at the sentencing hearing because it was subsequently invalidated. Blanco further contends that his subsequent retrial and reconviction for armed robbery are irrelevant to our inquiry here inasmuch as the reconviction was obtained after the sentencing hearing.

Blanco's claim is unique in that it has never been addressed by Florida's courts. However, a similar issue has been considered. In *Peek v. State*, 395 So.2d 492 (Fla.1980), the Supreme Court of Florida determined that convictions on appeal which were subsequently affirmed "were

---

**5.** The respondent contends that Blanco's prior burglary conviction should also be considered to substantiate the death penalty. The record, however, could not be clearer that the trial court did *not* use the burglary conviction as an aggravating circumstance, nor did the trial court consider it as another violent felony for the purposes of the sentence (T. 1856). Therefore, the fact that Blanco had this other valid conviction is precluded from consideration be-

cause it was expressly excluded by the trial court.

On reconsideration, Respondent contends that it never argued that the burglary was used for the "prior conviction" aggravating factor but rather as an "underlying felony." But *See* Respondent's Supplemental Response to Petition for Writ, p. 41–2. This Court appreciates Respondent's disavowal of this position, as it is erroneous.

in fact convictions at the time of sentencing." *Peek*, 395 So.2d at 499. The Court, however, also stated, "[w]e do not have the problem which would arise from the consideration as an aggravating circumstance of a conviction valid at the time of sentencing, that is subsequently reversed and vacated by an appellate court." *Peek*, 395 So.2d at 499. Here, the situation is one contemplated by Florida's Supreme Court, but left unanswered.

Our analysis of this issue begins with the case of *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). In that case, the United States Supreme Court has held that "if the sentencing judge had known that ... the respondent's previous *convictions* had been unconstitutionally obtained" the sentence might have been different. *Tucker*, 404 U.S. at 448, 92 S.Ct. at 592 (emphasis added). This is because a "conviction" memorializes and confirms that the defendant did indeed commit the charged criminal act. Accordingly, when considered as an aggravating circumstance, the Florida statute expressly requires that the defendant "was previously *convicted* of ... a felony involving the use or threat of violence to the person." Fla.Stat. Section 921.141(5)(b) (1985) (emphasis added).

Blanco's situation is analogous to that in *McCrae v. State of Florida*, 395 So.2d 1145 (Fla.1981). There, although the defendant had pled guilty to a previous violent felony, the trial court had withheld adjudication of guilt. Thus, there was no "formal conviction" of record. Nevertheless, the Supreme Court of Florida determined that although the trial court withheld adjudication of guilt, there still existed an "unrefuted factual determination that the defendant committed this prior criminal offense." *McCrae*, 395 So.2d at 1154. Here, what Blanco cannot dispute is that his prior violent crime, at the time of sentencing, factually existed. Thus, the act of the armed robbery was properly considered by the trial court, even if it was unaware of the infirmity in the initial conviction, because upon retrial, the fact that Blanco indeed had committed the crime was reaffirmed.

Blanco relies upon *Johnson v. Mississippi*, —— U.S. ——, 108 S.Ct. 1981, 100 L.Ed. 2d 575 (1988) as support for his proposition that the trial court would have reviewed Blanco's sentence differently in light of the prior unconstitutional conviction. At the time of this Court's original decision, *Johnson* had still not been decided by the United States Supreme Court. This Court, however, distinguished *Johnson* on the grounds that "*Johnson*, unlike the instant case, involved a conviction which was *completely* invalidated and *not* reinstated." The Supreme Court's decision affirms this Court's earlier determination. As Mr. Justice Stevens stated, "[s]ince the conviction has been reversed, *unless and until petitioner should be retried*, he must be presumed innocent." *Johnson*, 108 S.Ct. at 1986. Here, Blanco has not only been retried, but also reconvicted and the second conviction has been affirmed on appeal. Thus, unlike *Johnson*, here the jury was not allowed to consider evidence that is "materially inaccurate." *Johnson*, 108 S.Ct. at 1989.

Blanco also contends that when the Supreme Court of Florida refused to remand this case to the trial court for resentencing based upon the newly obtained and constitutionally valid armed robbery conviction, it improperly acted as a sentencer and overstepped its bounds as an appellate court. This contention elevates form over substance. The Supreme Court of Florida recognized that remand on this issue was pointless and a waste of scarce judicial resources. In this case, on remand, there would be nothing new for the trial court to consider. As the infirmity in the first armed robbery conviction was cured, there was no harm presented by the Supreme Court of Florida deciding the obvious. The Supreme Court of Florida simply reviewed the prior conviction in the same light as the trial court originally had because by the time the appellate review of this matter took place, Blanco had been reconvicted. Indeed, the concurring opinion of Mr. Justice White in *Johnson* confirms this view. As Justice White stated:

It is left to the Mississippi Supreme Court to decide whether a new sentenc-

ing hearing must be held or whether that Court should itself impose the appropriate sentence.... Cf. *Cabana v. Bullock,* 474 U.S. 376 [106 S.Ct. 689, 88 L.Ed.2d 704] (1986).

*Johnson,* 108 S.Ct. at 1989 (White, J., concurring).

In any event, because of this Court's resolution of issues XIII, XIV and XV, *infra,* Blanco's complaint that the jury has not had the opportunity to review the constitutionally obtained conviction, will be rendered moot.

Based upon the law and facts in this case, the use of the prior violent robbery conviction as an aggravating circumstance was proper.

## CLAIM IV: FELONY–MURDER AS AN AGGRAVATING CIRCUMSTANCE

Blanco was sentenced to death based upon two aggravating factors. One was the prior conviction, discussed in Claim III, *supra,* and the other was that the murder was committed while Blanco was engaged in the commission of a burglary (T. 1856–1857). Blanco claims that the use of the underlying felony as an aggravating circumstance for imposing the death penalty is error because it constitutes an impermissible "automatic" finding of an aggravating factor.

■ Initially, respondent argues that this claim is procedurally barred as neither Blanco's trial nor appellate counsel raised this issue in their respective forums. However, even if this issue has never been addressed, Blanco is correct that it may have been ineffective for previous counsel to have avoided this legal question and, therefore, this Court will discuss the merits of the claim.

■ There are two Florida statutes which must be analyzed in the context of whether the death sentence is the proper penalty for the crime of felony-murder. The first is Fla.Stat. Section 782.04 (1984) which defines first degree murder as:

(1)(a) The unlawful killing of a human being:

. . . .

2. When committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any:

. . . .

e. Burglary,....

is murder in the first degree and constitutes a capital felony, punishable as provided in s. 775.082.

Fla.Stat. Section 775.082 (1983), then refers to the second critical statute at issue, Section 921.141, entitled, "Sentence of death or life imprisonment for capital felonies; further proceedings to determine sentence". That section lists nine possible aggravating circumstances and seven possible mitigating circumstances. The aggravating circumstance at issue states:

(5): ... (d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any burglary,....

The United States Supreme Court has recently addressed the issue of whether the finding of a "single aggravating circumstance" which "merely duplicates an element of the underlying offense of first-degree murder," violates the Eighth Amendment of the United States Constitution. *Lowenfield v. Phelps,* —— U.S. ——, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In *Lowenfield,* the Court analyzed the Louisiana capital punishment scheme and stated the test for determining the question at hand:

To pass constitutional muster, a capital-sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."

*Lowenfield,* 108 S.Ct. at 554, citing *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); *cf. Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In other words, the finding that an aggravating circumstance exists is simply the first step in the determinative process which weans out those

defendants whom the legislature has previously determined are not a part of a class of convicted murderers who should be punished by this state's most severe and final sentence.

The United States Supreme Court has concluded, "the fact that the aggravating circumstance duplicated one of the elements of the crime does not make [the] sentence constitutionally infirm." *Lowenfield*, 108 S.Ct. at 555. As in *Lowenfield*, the Florida death penalty statute, although in a different manner, *narrows* the class of death-eligible murders by permitting, at the sentencing phase, the consideration of mitigating circumstances and the exercise of discretion. As the United States Supreme Court has stated, "[t]he Constitution requires no more." *Lowenfield*, 108 S.Ct. at 555.

Blanco's attempt to apply *Lowenfield* to obtain relief is not persuasive. Blanco reads *Lowenfield* to stand for the proposition that an aggravating factor can be considered at *either* the conviction stage, as in Texas and Louisiana, *or* the sentencing phase, as in Georgia, but not both. However, the *Lowenfield* Court's comparison of the various state death penalty schemes was not so mechanical. The Court's opinion does not forbid the existence of duplicate factors in both stages, but rather directs that the statutory scheme be studied to determine whether it produces the constitutionally required narrowing effect.

It is now settled that Florida's death penalty statute is constitutional. In *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the United States Supreme Court stated that "Florida, ... has ... enact[ed] legislation that passes constitutional muster.... [T]his system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed." *Proffitt*, 428 U.S. at 259–260, 96 S.Ct. at 2970, citing *Furman v. Georgia*, 408 U.S. 238, 310, 92 S.Ct. 2726, 2763, 33 L.Ed.2d 346 (1972). In the same regard,

> [t]he Florida capital-sentencing procedures seek to assure that the death penalty will not be imposed in an arbitrary or capricious manner. Moreover, to the extent that any risk to the contrary exists, it is minimized by Florida's appellate review system, under which the evidence of the aggravating and mitigating circumstances is reviewed and reweighed by the Supreme Court of Florida "to determine independently whether the imposition of the ultimate penalty is warranted."

*Proffitt*, 428 U.S. at 253, 96 S.Ct. at 2967.

Here, Blanco fails to take into account that even if he was convicted of a murder without consideration of the underlying felony, the underlying felony would still exist as a factor which narrows the class and which, to Blanco's detriment, he still belongs. In other words, Blanco is not entitled to an automatic exclusion from the class of death-sentence qualified convicts if the factors which apply to him happen to overlap. The test is whether the statutory scheme is constitutionally appropriate, no more, no less.[6] Therefore, Blanco's challenge to consideration of felony-murder as an aggravating factor cannot succeed.

---

**6.** This Court finds that Blanco's citation to *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) to support Claim IV is misplaced. In affirming the imposition of the death penalty in *Tison*, the United States Supreme Court distinguished that case from *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1986). In *Enmund*, the defendant was the driver of a "getaway car" and did not take part in the actual murder. The Court, in vacating the death sentence, found that Enmund's "participation in the felony murder was so attenuated ... [that] (citation omitted) the death penalty was excessive retribution for his crimes." *Tison*, 107 S.Ct. at 1683–1684. In *Tison*, however, the defendants' "degree of participation in the crimes was major rather than minor." *Tison*, 107 S.Ct. at 1684. Here, Blanco was the person who pulled the trigger seven times and killed the victim. Certainly, Blanco's situation is more analogous to that in *Tison* than in *Enmund*. The Court in *Tison* explained:

> This substantial and recent legislative authorization of the death penalty for the crime of felony murder regardless of the absence of a finding of an intent to kill powerfully suggests that our society does *not* reject the death penalty as grossly excessive under these circumstances.

*Tison*, 107 S.Ct. at 1686. Accordingly, contrary to Blanco's contention, *Tison* supports the imposition of the death penalty here.

319

### B. *Aggravating Circumstances: Conclusion*

In brief, the Florida statutory scheme does not *mandate* the imposition of the death penalty under any circumstance. The statute provides a balancing test where any aggravating circumstances are weighed against any mitigating factors. In this case, although Blanco is correct that premeditation was not and cannot be utilized as an aggravating circumstance, because two other aggravating factors were validly considered, those being the previous commission of an armed robbery and the underlying felony of armed burglary, together with the fact that there was no finding of mitigating circumstances, compels the conclusion that Blanco's challenge to his death sentence based upon an improper application of Florida's death penalty statute is DENIED.

### CLAIM V: SUFFICIENCY OF EVIDENCE

Blanco, styling this claim as one which implicates the sufficiency of the evidence, maintains that his conviction could only be valid if the verdict was predicated upon the jury finding of *both* premeditated murder and felony murder. For this argument, Blanco relies upon *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), a freedom of speech case for the proposition that, "[i]f *either* basis was unconstitutional, the conviction cannot stand."

Blanco has taken *Stromberg* completely out of context. In *Stromberg*, the Court held that one of the clauses in a California statute, which made displaying a red flag as an emblem of opposition to organized government a criminal act, was invalid. Therefore, the conviction required reversal. Here, however, Florida's statutory scheme is constitutional. See *Proffitt*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), *supra*. Although this Court finds that no premeditation as an aggravating factor existed, as did the Supreme Court of Florida, the lack of premeditation as an aggravating factor does not in any manner circumscribe the weight of the evidence produced at trial to support the conviction, nor does

it preclude a finding of premeditated murder. See discussion of Claim II, *supra*.

The standard used to determine whether the evidence was sufficient to support a conviction is well-settled in the Eleventh Circuit:

'It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of evidence.' In making this determination, we must view the evidence in the light most favorable to the government, (citation omitted) and accept reasonable inferences and credibility choices by the fact-finder. *United States v. Gonzalez*, 719 F.2d 1516, 1521–22 (11th Cir.1983).

*United States v. Rosenthal*, 793 F.2d 1214, 1225 (11th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987).

Here, the evidence against Blanco included the identification of Blanco by eyewitness Thalia Vezos, Blanco's driver's license and wallet which were found in the victim's home, the BOLO supplied by Vezos which substantially matched Blanco's description, the identification by Abdeni, and the fact that Blanco was found near the scene of the crime. In light of these facts, Blanco's conviction is amply supported by the record and therefore Claim V is DENIED.

### CLAIM VI: ADMISSION OF STATEMENTS

Blanco's next claim is two-fold. First, he contends his arrest was illegal. Therefore, any statements obtained from him as a result of that arrest, should not have been introduced at trial. Second, Blanco maintains that, even assuming his arrest was legal, the statements were still excludable because they were obtained in violation of his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The statements at issue are (1) Blanco's remark to the police that he had

left his wallet and identification at home; and (2) Blanco's alleged comment to a police officer that he regularly rode his bicycle to the Fort Lauderdale area and then ran several miles along the beach (T. 1436–37).

■ This Court reaffirms its previous finding that the BOLO supplied sufficient probable cause, therefore, Blanco's arrest was valid. (See discussion in Claim I, *supra*). Accordingly, Blanco's first argument fails.

■ However, Blanco is correct that after he was arrested he was interrogated without receiving the appropriate *Miranda* warnings (T. 177). The trial judge did suppress these statements but, specifically determined that because Blanco's statements were voluntary, they were admissible for impeachment purposes (T. 177).[7] The statements were not introduced in the state's case-in-chief, but were used only after Blanco took the stand in his defense for the purpose of impeaching his credibility.

This Court's analysis begins and ends with *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), where the United States Supreme Court addressed the precise issue at hand, that is, whether a statement made by a suspect to the "police under circumstances rendering it inadmissible to establish the prosecution's case in chief under *Miranda v. Arizona*, (citation omitted) may ... be used to impeach his credibility." *Harris*, 401 U.S. at 222, 91 S.Ct. at 644. The Court answered in the affirmative and found that admission of the statement for impeachment purposes was proper. The Court reasoned:

> Petitioner's testimony in his own behalf concerning the events of [the night of the crime] contrasted sharply with what he told police shortly after his arrest. The impeachment process here undoubtedly provided valuable aid to the jury in as-

sessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief.

*Harris v. New York*, 401 U.S. at 225, 91 S.Ct. at 645.

Although Blanco disputes the trial court's finding that the statements were voluntary, the evidence supports that decision, which was subsequently upheld by the Supreme Court of Florida. *Blanco I*, 452 So.2d at 524. Officer Perez–Cubas testified that he did not threaten, make promises or physically touch Blanco (T. 109). The officer testified that after Blanco was taken to the homicide scene, Blanco was questioned only as to what he was doing in the area (T. 107–108). Blanco was subsequently taken to the police station and was read his *Miranda* rights (T. 111). Officer Perez–Cubas interpreted each of the rights in Spanish to which Blanco answered that he understood his rights (T. 114). Officer Perez–Cubas described Blanco's attitude during all questioning as "very relaxed" and Blanco answered the inquiry regarding his wallet without hesitation (T. 115).

At the police station, Blanco requested to speak to an attorney. Notwithstanding this request, the officers showed him a purse, wallet and driver's license and asked Blanco whether he recognized those items (T. 114–115). Blanco answered that those were his belongings but thought "he left his possessions and driver's license back in his apartment" (T. 114; 1438).

During direct examination, Blanco contradicted the officer's statement and instead, testified that he had lost his "purse," which contained his driver's license, and

---

7. In making this determination during the suppression hearing, the trial court properly inquired into the issue of voluntariness pursuant to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1954). "In *Jackson v. Denno* ..., the Supreme Court held that, when a de-

fendant objects to the introduction of his statement as involuntary, due process requires a trial judge to make an independent determination that the statement is voluntary before permitting it to be heard by the jury." *Miller v. Dugger*, 838 F.2d 1530, 1535 (11th Cir.1988).

believed that he had left those items at his friend's home (T. 1425–1426).[8] On cross examination, the State was permitted to question Blanco as to the whereabouts of his wallet and driver's license (T. 1437–1439). Blanco denied that he had made the statements in question or that the officer had even asked him about the location of the wallet and identification (T. 1438–1439).

Although Blanco's right to terminate questioning should have been honored when he requested an attorney, "the *Miranda* opinion does not create a *per se* proscription of any further interrogation." *Michigan v. Mosley*, 423 U.S. 96, 103 n. 9, 96 S.Ct. 321, 326 n. 9, 46 L.Ed.2d 313 (1975). "The question whether a confession was voluntarily made necessarily turns on the 'totality of the circumstances'." *Boulden v. Holman*, 394 U.S. 478, 480, 89 S.Ct. 1138, 1140, 22 L.Ed.2d 433 (1969). A trial "court's determination that a statement was voluntary [should not be "upset"] unless clearly erroneous." *United States v. De Parias*, 805 F.2d 1447, 1456 (11th Cir.1986), citing *United States v. Beck*, 729 F.2d 1329, 1333 (11th Cir.1984), *cert. denied*, 469 U.S. 981, 105 S.Ct. 383, 83 L.Ed.2d 318 (1984).

With this standard in mind, this Court has carefully reviewed the record, including the transcript of the suppression hearing, the testimony by Officer Perez–Cubas and the cross examination of Blanco. After "an independent study of the entire record," this Court finds that the trial court was correct in determining that Blanco's statements were voluntary. *Boulden*, 394 U.S. at 480, 89 S.Ct. at 1140. The statements were not coerced, and did not amount to a "confession," as Blanco did not admit to killing the victim, nor did he admit he had anything to do with the murder. Here, as in *De Parias*, the record

does "not [indicate] any untoward pressure or unfair tactic." *De Parias*, 805 F.2d at 1456. Based upon these facts, this claim is DENIED.

CLAIM VII: INSTRUCTION TO JURY REGARDING NUMBER OF JURORS NEEDED TO RETURN A LIFE SENTENCE

■ Blanco contends that the jury was improperly instructed that a majority was needed to return a sentence of life imprisonment. The correct statement of the law in Florida is that a tie among the jurors will result in the imposition of a life, rather than a death sentence.

The Eleventh Circuit has addressed this exact issue in *Henry v. Wainwright*, 743 F.2d 761 (11th Cir.1984). In *Henry*, the jury was instructed that "seven or more of you must agree upon the recommendation you submit to this Court." *Henry*, 743 F.2d at 763. As here, the defendant in *Henry* failed to make a contemporaneous objection at trial required by Florida case law. *Ford v. Wainwright*, 451 So.2d 471, 475 (Fla.1984).[9] The jury in *Henry* returned a recommendation of death by a 7–5 vote. The defendant in *Henry* failed to proffer any evidence or point to anything in the record that would suggest that the jury was, in fact, ever equally divided in its deliberations, thereby rendering the claim a "remote" possibility which could not afford any relief.

Here, the jury's recommendation, by an 8–4 majority, was that the death sentence be imposed. As in *Henry*, Blanco has not supported his claim with any evidence or shown that any part of the record would demonstrate that the jury was ever evenly divided.[10] Therefore, as in *Henry*, this claim must be DENIED.

---

**8.** There was some confusion as to whether Blanco was referring to a "purse" or to a "wallet" (T. 1422–1424), but it seems as though Blanco only identified the *wallet,* not the purse in which the wallet was found (T. 1424).

**9.** The issue of what a trial court should do in the event of an even division among the jurors in the sentencing phase of a death case was not addressed by the Supreme Court of Florida until after the sentencings of both the defendants in

*Henry* and *Blanco. Rose v. State,* 425 So.2d 521 (Fla.1983).

**10.** This claim was not raised on direct appeal and was rejected on procedural grounds in *Blanco II.* However, as the issue is so directly controlled by *Henry,* this Court sees no purpose to deny Blanco the knowledge that his claim is simply not meritorious.

## CLAIM VIII: PROSECUTOR'S CLOSING ARGUMENT AT SENTENCING

■ Blanco claims that the prosecutor injected inflammatory remarks into his closing argument at sentencing which prejudiced the jury's recommendation.[11] The remarks at issue referred to the victim, John Ryan, and his family, particularly, a comparison between Blanco and the victim by the prosecutor, stating:

> There was (sic) two people that were complete strangers, and it didn't matter who John Ryan was. The only thing we know about John Ryan from the testimony at trial is that he wasn't born in this country, either. He was born in Ireland, and that (sic) he was a loving uncle, and he was an asset to the community.

(T. 1829).

Blanco argues that the above-referenced portion of the prosecutor's sentencing argument prejudicially contrasted "good immigrants" against "bad Marielitos."[12] Blanco relies upon the case of *Booth v. Maryland,* — U.S. ——, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), *reh'g denied,* — U.S. ——, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987), for the proposition that the attributes of the victim are irrelevant to the sentencing determination.

In *Booth,* the prosecution at sentencing introduced "a victim impact statement (VIS), describing the effect of the crime on the victim and his family." *Booth,* 107 S.Ct. at 2531. The VIS focused extensively on "the emotional trauma suffered by the family and the personal characteristics of the victims." *Booth,* 107 S.Ct. at 2533. Presentation of the VIS resulted in "[t]he prospect of a 'mini-trial' on the victim's character." *Booth,* 107 S.Ct. at 2535. Here, in contrast, the prosecutor's main focus in closing argument at sentencing was on Blanco's crime and the statutory reasons for imposing the death penalty (T. 1830–1833).

In reviewing a sentencing argument, this Court must determine whether the argument was "so prejudicial, when viewed in the context of the entire sentencing proceeding, as to have rendered that proceeding 'fundamentally unfair.' " *Johnson v. Wainwright,* 778 F.2d 623, 630 (11th Cir. 1985), citing *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.1985), *vacated on other grounds,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986); and *Donnelly v. De-Christoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Here, the comments by the prosecutor were minimal and in no manner compared to the VIS submitted in *Booth.* Further, the Court in *Booth* narrowed its holding to similar situations and realized that such comments are not always cause for reversible error.

> Our disapproval of victim impact statements at the sentencing phase of a capital case does not mean, however, that this type of information will never be relevant in any context.

> . . . .

> The trial judge, of course, continues to have the primary responsibility for deciding when this information is sufficiently relevant to some legitimate consideration to be admissible, and when its probative value outweighs any prejudicial effect. *Cf.* Fed.R.Evid. 403.

*Booth,* 107 S.Ct. at 2535 n. 10.

Based upon a review of the entire sentencing argument, this Court finds that the prosecutor's comments did not rise to the level of a *Booth* claim and therefore, this claim is DENIED.

## CLAIMS IX, X, XI, XII, XIII and XIV: INEFFECTIVE ASSISTANCE OF COUNSEL

Claims IX through XIV raise issues and facts which Blanco contends demonstrated that his two trial attorneys, Carlos Rodriguez and Don Tenbrook, provided ineffec-

---

**11.** The Supreme Court of Florida found that this claim was procedurally barred and did not address the merits. *Blanco II,* 507 So.2d at 1380. In light of the recent case *Booth v. Maryland,* — U.S. ——, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), *reh'g denied,* — U.S. ——, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987), this Court will address the merits.

**12.** The prosecution did not explicitly use the term "Marielito" or make any such reference during closing argument at sentencing.

tive assistance of counsel in violation of his Sixth Amendment rights. This Court, on January 4–5, 1988, held a full evidentiary hearing on all of these claims. (Citations to the transcript of proceedings before this Court will be designated with the letter "D.")

■ The claims must be judged by the same test, and therefore, an overview of the law is appropriate. The United States Supreme Court set standards for determining whether "a conviction or death sentence should be set aside because counsel's assistance at the trial or sentencing was ineffective" in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court developed a two-part test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. In reviewing "a federal habeas challenge to a state criminal judgment, [the issue of ineffectiveness of counsel is a] mixed [question] of law and fact." *Strickland,* 466 U.S. at 698, 104 S.Ct.at 2070. Additionally, both parts of the *Strickland* test need not be analyzed "if the defendant makes an insufficient showing on one." *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2063.

At this juncture, this Court will discuss the facts of each ineffective assistance of counsel claim.

## CLAIM IX: PROCEEDINGS CONDUCTED IN THE ABSENCE OF BLANCO AND AN INTERPRETER

### A. *Blanco's Absence*

■ Blanco cites to several instances during his pre-trial and trial proceedings when he was not present in the courtroom. All of the incidents occurred outside the presence of the jury and all the discussions pertained to legal matters. Further, at these times, the defense counsel either waived Blanco's presence or did not object to his absence.

This claim was raised and addressed in *Blanco I* and *Blanco II.* The Supreme Court of Florida determined that this claim was procedurally barred in *Blanco II.* However, this Court considered evidence regarding this claim at the evidentiary hearing it conducted, accordingly, the merits will be addressed. Based on the evidence presented and a thorough review of the trial transcript, this Court finds that, on the merits, the cited incidents where Blanco was absent from the courtroom, were simply "not ... critical [s]tages of the trial proceedings." *United States v. Vasquez,* 732 F.2d 846, 849 (11th Cir.1984), and therefore, this claim is DENIED.

### B. *Interpreter's Absence*

■ Prior to trial, defense counsel requested the presence of an interpreter. At various times throughout the proceedings, however, an interpreter was not, in fact, in the courtroom. During those times, co-defense counsel, Mr. Rodriguez, although not literally, translated all or most of the proceedings. This claim was *not* raised in *Blanco I,* but *was* raised in *Blanco II.* Although the Supreme Court of Florida found that the claim was procedurally barred and not "cognizable on collateral review", it briefly discussed the merits. *Blanco II,* 507 So.2d at 1380. The Court in *Blanco II* relied upon its opinion in *Suarez v. State,* 481 So.2d 1201 (Fla.1985), where the Court confirmed that,

[t]hough the Court must afford the defendant full opportunity to obtain all the benefit of this constitutional right [to confront witnesses] and, to that end, to understand testimony of the witnesses against him, so that a proper cross-examination may be had, we know of no affirmative duty devolving on the court to see that the defendant does have interpreted to him everything that is said and done, as it occurs, during the progress of the trial. The court in this case surely performed its full duty of preserving to the defendant his rights in that regard by appointing the interpreter selected by the defendant, an interpreter who was admittedly competent, and who was appointed for the declared purpose of interpreting and explaining to the defendant all of the things said and done during the trial.

*Suarez,* 481 So.2d at 1204. This Court agrees with the Supreme Court of Florida that this claim is both procedurally barred as well as lacking merit.

Blanco's counsel fulfilled their obligation by requesting an interpreter. Further, even if counsel were in error by failing to ensure that an interpreter was present at every stage of the proceedings, "setting aside the judgment [of the trial court is not warranted] if the error had no effect on the judgment." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Here, whatever gaps in interpreting may have occurred were at non-critical stages in the proceedings and therefore, any error was harmless. Thus, this claim too, is DENIED.[13]

## CLAIM X: BLANCO'S COMPETENCY TO STAND TRIAL

This Court held an extensive evidentiary hearing on Blanco's mental competency and whether his counsel were ineffective for failing to raise this as an issue at the trial and sentencing stages. The Supreme Court of Florida rejected this claim in *Blanco II* stating:

[T]he record shows that trial counsel considered obtaining a psychiatric examination, but with [Blanco's] concurrence, decided not to do so because [Blanco] gave every appearance of competency and a theory of incompetency would dilute [Blanco's] strategy of denying guilt.

*Blanco II,* 507 So.2d at 1383.

Blanco bases his claim that he was incompetent to stand trial on his alleged "organic brain damage" and his inability, as a Mariel refugee, to appreciate the differences between the Cuban and American justice systems. At the evidentiary hearing before this Court, Blanco presented the testimony of two witnesses to substantiate his claim.

The first witness, Dr. Harry Krop, a clinical psychologist, developed an opinion as to Blanco's competency without examining Blanco (D. 143). Dr. Krop's evaluation resulted from reviewing the trial transcript, interviewing Blanco's brother and reading some other related materials (D. 144). Dr. Krop did not, however, consider the psychological profile done by the Department of Corrections, nor did he have any direct contact with Blanco or his trial attorneys (D. 165–173). After considering the information, Dr. Krop determined that Blanco's "competency certainly was questionable" (D. 160). In brief, this Court is not persuaded that Dr. Krop's incomplete evaluation supports Blanco's claim.

Blanco's next witness was Dr. Dorita Marina, a clinical psychologist and psychoanalyst, with experience in handling cultural and psychological problems of Mariel refugees. Dr. Marina devoted a large amount of time to evaluating Blanco's mental competency, including interviewing Blanco and administering psychological tests for over four hours, speaking to Blanco's brother for about one-half hour, and reviewing the trial transcript and psychological reports by other doctors regarding Blanco's condition. Based predominantly on her analysis of Blanco's test results, Dr.

---

**13.** Certainly, imposing upon counsel to both defend and interpret is not the preferred method of providing a translation of the proceedings, and, in the appropriate circumstances might raise questions of depriving counsel the ability to effectively represent his client. But here, these gaps were minimal.

Marina diagnosed Blanco as suffering "from a bipolar disorder mixed with psychotic features" (D. 183).

This diagnosis, however, was based upon a description in an outdated edition of a manual called *Diagnostic and Statistical Manual of Mental Disorders* (D. 261). Moreover, throughout the course of questioning at the evidentiary hearing, Dr. Marina made several contradictory statements and was forced to reassess her conclusions. For example, Dr. Marina testified on direct-examination that Blanco's test results showed no indication of any violent tendencies (D. 215). On cross-examination, however, Dr. Marina admitted to being unaware that Blanco had been previously convicted of a violent felony and upon learning of this information, she changed her conclusion stating, "I think that that (sic) would have meant that there is a tendency for impulsive behavior which can be of an aggressive nature" (D. 274). Given the inconsistencies in Dr. Marina's testimony, this Court was not convinced that her testimony was credible.

In light of the above discussion, it is apparent that there can be no basis to support a claim of ineffective assistance because Blanco has failed to establish that he was, in fact, at the time of trial, incompetent. Moreover, an examination of the record highlights the invalidity of this claim. Blanco's counsel, Mr. Rodriguez, testified that he had no reason to believe Blanco was incompetent (SCP. 441). Mr. Rodriguez and Blanco were able to communicate about the case and counsel's trial strategy (SCP. 408–11). The breakdown in communication occurred, not because of a lack of mental competency, but because Blanco simply disagreed with his counsel as to which witnesses should be called (D. 87–91; 122).

The Eleventh Circuit recently addressed the issue of whether an attorney is ineffective for failing to obtain a psychiatric examination. In *Daugherty v. Dugger*, 839 F.2d 1426 (11th cir. 1988), the Court stated:

> Where ... the defendant himself gives counsel reason to believe that further investigation of the defendant's mental condition would be useless or even harmful to the defense, then the decision not to further investigate is reasonable. *Strickland*, 466 U.S. at 691 [104 S.Ct. at 2066].

*Daugherty*, 839 F.2d at 1431.

Here, the evidence clearly supports a finding that Blanco's counsel were absolutely reasonable in deciding not to put on psychiatric testimony. The evidence presented by Blanco was simply not believable. Similarly, Blanco's request on reconsideration that a second evidentiary hearing be permitted to present more evidence on this issue is rejected. The evidence Petitioner now seeks to submit could have, but was not, presented at the first hearing. As stated above, Blanco cannot now obtain yet another bite at the apple. Somewhere the process must end. Accordingly, Claim X is DENIED.

## CLAIM XI: INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

Blanco maintains that he was denied a meaningful and individualized sentencing determination based upon his counsel's alleged failure to (1) investigate Blanco's family history; (2) present information on the "Mariel" plight; and (3) present a psychiatric or psychological evaluation. The merits of this claim were exhaustively considered and denied on motion for post-conviction relief at the trial level and again in *Blanco II*, 507 So.2d at 1381–83. Additionally, this Court heard evidence and considered proffers by counsel regarding this claim.

Blanco asserts that his trial counsel failed to adequately investigate his family background to establish a claim of mitigation, thereby rendering counsels' assistance ineffective. The record reveals that Blanco himself failed to communicate to his counsel that he had family and friends available. *Blanco II*, 507 So.2d at 1382. More crucial to this analysis, however, is the strategy behind counsels' decision not to pursue such testimony. The evidence gathered by Blanco's present counsel reveals Blanco's numerous encounters with the police in Cuba. This fact would undoubtedly have been brought out at sen-

tencing upon questioning Blanco's family members. The record further belies Blanco's contention that his counsel conducted no investigation. Counsel tried to reach Blanco's brother and friends numerous times to no avail (D. 43–44; 70–72).

 Applying the standard enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court recently addressed the issue of whether failure to investigate a petitioner's background for mitigating circumstances constitutes ineffective assistance of counsel. *Burger v. Kemp,* —— U.S. ——, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). The Court in *Burger* restated *Strickland's* standards.

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. (Citation omitted.) A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

*Burger,* 107 S.Ct. at 3123, citing *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Based upon the fact that Blanco's brother failed to aid counsel at trial, despite attempts to reach him, along with the harmful information about Blanco's criminal history in Cuba, lead to the conclusion that trial counsel's investigation into Blanco's background was adequate. *Burger,* 107 S.Ct. at 3126. Indeed, even if, with hindsight, counsels' conduct could be seen as deficient, in view of all the evidence presented, Blanco has failed to demonstrate with any certainty that the presentation of family background information would have changed the outcome at sentencing. See *Elledge v. Dugger,* 823 F.2d 1439 (11th Cir.1987), *modified on other grounds,* 833 F.2d 250 (11th Cir.1987);

*Lightbourne v. Dugger,* 829 F.2d 1012 (11th Cir.1987); *Thompson v. Wainwright,* 787 F.2d 1447 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987), *reh'g denied,* —— U.S. ——, 107 S.Ct. 3247, 97 L.Ed.2d 751 (1987); and *Mitchell v. Kemp,* 762 F.2d 886 (11th Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987).

 Blanco next claims that counsel was ineffective for failing to present any information at sentencing in an attempt to disprove the "Marielito. myth." Although prejudice may have been abundant in South Florida during the time of Blanco's trial, his counsel's strategy was precisely geared toward minimizing attention to Blanco's cultural background (SCP. 413–14). Counsel believed that any mention of Blanco's Mariel status above that which was absolutely necessary, would be harmful to the case (SCP. 413–14). The evidence, in any event, does not support Blanco's assertion that the jury was not impartial. *Blanco II,* 507 So.2d at 1381–82. This Court, therefore, finds that counsel met the standards in *Strickland* and were not ineffective.

Finally, Blanco again raises counsel's failure to present evidence of Blanco's mental capacity at the sentencing stage. This Court has extensively discussed the reasons why this claim lacks merit (see Claim X, *supra*). Therefore, counsel were not ineffective for failing to present a psychiatric or psychological evaluation at sentencing.

Based upon the foregoing analysis, this claim is DENIED.

CLAIM XII: TRIAL COURT DIRECTIONS TO BLANCO'S COUNSEL REGARDING PRESENTATION OF DEFENSE CASE

Blanco's attorneys at the trial and sentencing phases were publicly appointed to represent Blanco. Blanco initially agreed to this representation and both counsel, Mr. Rodriguez and Mr. Tenbrook, conducted themselves' without any *pro se* representations by Blanco until the defense's case-in-

chief was presented (D. 87).[14] At that time, a disagreement between Blanco and his counsel arose because the attorneys did not want to call certain witnesses. Defense counsel had determined that the possible testimony would conflict with Blanco's or in other ways disprove Blanco's defense (D. 50).

In essence, defense counsel had planned to present an alibi defense, claiming that Blanco could not have been the person who dropped his wallet at the murder scene on the night in question because he had lost his wallet, which contained his identification, days before the crime occurred (D. 40). As discovery progressed, however, counsel determined that any possible alibi witnesses might present conflicting testimony, and therefore, felt it was in Blanco's best interests to refrain from calling those witnesses (T. 1457–1463).

Blanco, on the other hand, strongly believed that those witnesses would provide beneficial information to his case (D. 53). Blanco became particularly upset upon learning that defense counsel's efforts to serve a desired witness with a subpoena were unsuccessful and filed a *pro se* motion requesting that he be afforded substitute counsel (D. 52; T. 1459–60; 1962). The trial judge denied the motion, but ordered defense counsel to locate Blanco's requested witnesses and present their testimony (D. 53; T. 1467–69).

Upon the judge's order that the witnesses in question be called, both defense counsel moved to withdraw (T. 1469). That motion, which was previously asserted and denied along with Blanco's motion to change counsel, was again denied (T. 1469).

The presentation of Blanco's defense at trial raises unique questions regarding a trial judge's interference in a defense counsel's trial strategy. The law in this circuit is quite clear that, "[a] lawyer must be able to determine questions of strategy during trial, and unless there are exceptional circumstances or unless the lawyer is so incompetent as to deprive the defendant of the right to effective assistance of counsel, his decision regarding trial strategy must be binding." *Coco v. United States,* 569 F.2d 367, 371 (5th Cir.1978), citing *United States ex rel. Cruz v. LaVallee,* 448 F.2d 671, 679 (2d Cir.1971), *cert. denied,* 406 U.S. 958, 92 S.Ct. 2064, 32 L.Ed.2d 345 (1972). Here, Blanco's present attorney's argument is not that trial counsel was ineffective for not presenting the requested witnesses, but rather that the Court created an unfair trial because of its interference with defense counsel's strategy.[15]

■ This Court finds that both defense counsel prepared their trial strategy and determined through interviewing possible witnesses and investigating Blanco's alibi story, that Blanco's case would be hurt rather than helped by presentation of those witnesses. However, the trial judge allowed Blanco's wishes to preempt his counsel's trial strategy. The court's conduct led to the presentation of two witnesses, over the strong objection of counsel (T. 1467–69). The testimony of the two witnesses, which defense counsel knew to be conflicting, was presented because of Blanco's belief that the jury could determine "if the [the witnesses] are telling the truth or to see if I'm lying" (T. 1477–79). Despite Blanco's obvious confusion regarding the evidentiary process, the trial court insisted that those witnesses be placed on the stand.

A trial judge is given wide discretion in conducting a trial. There are limits, how-

---

**14.** The transcript of the evidentiary hearing before this Court on January 4–5, 1988, is designated as "D" for district court proceedings.

**15.** Although Blanco's present counsel argues that the trial court's conduct rendered trial counsel "ineffective," this issue is not, should not, and will not, be addressed as an ineffective assistance of counsel claim. Instead, as it must, this Court will address this issue as whether the trial court's conduct constituted reversible error. This question was answered in the nega-

tive in *Blanco I* and *Blanco II* but, after conducting a full evidentiary hearing, this Court is not convinced that those rulings, as they pertain to this issue, were correct. Respondent's argument on reconsideration that the trial court "did not direct the defense but rather only enforced Petitioner's rights under the Sixth Amendment" is, under the facts presented in this record, a position which wholly ignores the reality of what transpired in the courtroom at trial.

ever, which, if exceeded, can hamper a defendant's right to a constitutionally valid trial. The Eleventh Circuit has described the accepted standard for gauging a judge's trial conduct:

> A trial judge is, ... more than a mere moderator and is under a duty to question witnesses and comment on evidence when it appears necessary.
>
> . . . .
>
> On the other hand, a trial judge improperly interjects himself into the trial by questioning witnesses when the attorneys are competently conducting their cases.

*United States v. Block*, 755 F.2d 770, 775 (11th Cir.1985). Here, the trial court went beyond merely "questioning" witnesses, but actually called witnesses over and above the objection of counsel, thereby impermissibly interfering with their considered trial strategy. "A trial judge ought not comment to a criminal defendant about the pros and cons of calling each witness. Trial strategy is for the defendant's counsel, guided by consultation with his client." *Moore v. United States*, 598 F.2d 439, 445 (5th Cir.1979). Despite the Court's "compassion" for defendant's unhappiness with his counsel's strategy, the Court went beyond these "reasonable limits" and, ironically, in an attempt to protect Blanco's right to a fair trial, could have created one which was unfair. *United States v. Bertram*, 805 F.2d 1524, 1529 (11th Cir.1986).

This interference was not adequately addressed by either the direct or the collateral appellate opinions. In addressing this issue on the direct appeal, the Supreme Court of Florida relied on *Milligan v. State*, 177 So.2d 75 (Fla. 2d DCA 1965) for the proposition that "[t]he ultimate decision [as to which witnesses should be presented] is the defendant's." *Blanco I*, 452 So.2d at

524. The Court's reading of *Milligan* is curious, as that case dealt with a trial court's failure to comply with a statute requiring a minor's parents to be notified of a criminal charge pending against the minor. The Court in *Milligan* held that, although a minor is represented by counsel, the court is not exempt from notifying the parents because "the attorneys' function is to present alternative courses of action, not make decisions. The ultimate decision-making function is to be left to the client." *Milligan*, 177 So.2d at 77. It is clear that *Milligan* has no bearing or relation to the issue presented here, *an issue regarding trial strategy*, which remains in the domain of the attorneys' control.

In *Blanco II*, the Court once again skirted this issue by stating, "[i]t is not rare for counsel and defendant to disagree on strategy or tactics and, when they are unable to agree, we see no prejudice in seeking the advice or direction of the trial judge." *Blanco II*, 507 So.2d at 1383. The record demonstrates, however, that neither Blanco nor his trial counsel requested any guidance from the trial court, but rather, both moved for a change of counsel. On its own initiative, the trial court took control of the defense by ordering Blanco's attorneys to follow Blanco's desired trial strategy.

Instead of delving into defense counsel's strategy and preempting the decisions which should have been made by Blanco's counsel, the trial court had several less intrusive options. It could have permitted substitution of counsel, it could have conducted a *Faretta* inquiry and allowed Blanco to proceed *pro se*,[16] or it could have authorized a hybrid representation whereby trial counsel continued to assist Blanco in an advisory capacity. *United States v. Mills*, 704 F.2d 1553, 1557 (11th Cir.1983). Finally, the trial court could have simply denied both motions and permitted defense counsel to proceed as they saw fit. In this

---

**16.** Blanco asserts that the trial court should have conducted an inquiry into Blanco's competence to represent himself *pro se* at the point in the trial where the court allowed Blanco to determine which witnesses should be called. This may be so, *see, Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975),

however, the record belies any desire by Blanco to represent himself *pro se*. His request was for a "[c]hange of counsel" (T. 1962), indicating that he still wanted to be represented by an attorney. In any event, the clear error here was in the trial court's overbearing interference into defense counsels' strategy.

last mentioned scenario, if defense counsels' strategy proved to be erroneous and prejudicial, Blanco would have preserved an appropriate claim of ineffective assistance of counsel.

The trial court elected none of these alternatives but instead, chose to sail onto an uncharted and dangerous sea by directing the defense's ship. As a result, the defense presented the testimony of Fidel Romero and Enrique Gonzalez, both convicted criminals, who were incarcerated at the time of the trial. Romero's testimony supported Blanco's alibi theory. Romero testified that prior to Blanco's arrest, he helped Blanco look for the allegedly lost identification at several places (T. 1496–98). Defense counsel's strategy, however, was to avoid any testimony about the search for the lost possessions, as they believed such witnesses had conflicting stories. In reviewing the testimony of Enrique Gonzalez, those reservations proved accurate. Gonzalez testified on direct that he did, in fact, accompany Blanco to several places, including a couple of apartments where Blanco had been, as well as a bar. On cross-examination, however, respondent impeached Gonzalez's testimony with his own statements taken by respondent the very day before (T. 1516–19). In his statement, Gonzalez declared that he was sure he did *not* go to a bar looking for Blanco's papers (T. 1518–19). Gonzalez explained his change in story by telling the jury that he did not recall the incident when he made the statement, but suddenly regained his memory at the trial (T. 1518–19).

Here, the issue is whether the questionable credibility of this testimony combined with the fact that both Romero and Gonzalez were convicted criminals tainted Blanco's defense so that the trial became unfair and rendered the verdict suspect. In light of all the testimony presented, especially that offered by respondent in its case-in-chief, the evidence so overwhelmingly established Blanco's guilt that any contradiction presented by these two witnesses had a *de minimus* impact upon the guilt-innocence portion of Blanco's trial. Therefore, although the trial court's complete disregard for defense counsels' deliberate

trial strategy was clear error, the error was not so prejudicial at the guilt-innocence phase of the trial to warrant the issuance of a writ of habeas corpus. Thus, this claim must be DENIED. However, its effect on the sentencing phase of the trial is another matter and will be discussed below.

## CLAIM XIII: TRIAL COURT'S INTERROGATION OF BLANCO AND CONCURRENT FAILURE TO WARN THAT ANSWERS ELICITED COULD BE USED IN SENTENCING AND INEFFECTIVENESS OF TRIAL COUNSEL FOR FAILING TO OBJECT

Blanco claims that the trial court erred in failing to warn him that any statements he made during the proceedings could be used against him for sentencing purposes. Furthermore, Blanco contends that information which was improperly elicited by the trial court during the guilt-innocence phase as well as the sentencing phase, so tainted the sentencing hearing as to render his right to a fair sentencing hearing a nullity. The Tenth Circuit Court of Appeals has held that "[t]itle 18 U.S.C. [Section] 3577 codifies the trial court's right to conduct a broad inquiry prior to sentencing. This right is subject to constitutional limitations, however." *United States v. Jones,* 640 F.2d 284, 286 (10th Cir.1981), citing *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) and *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed.2d 1690 (1948).

Here, as at trial, the court impermissibly interferred with defense counsels' function at sentencing. As explained in Claim XII, *supra,* the trial court's conduct was erroneous and in this instance, the error did prejudice the court's ruling at sentencing.

While the trial court's observations of Blanco's demeanor during trial was appropriately considered, *Johnson v. Wainwright,* 778 F.2d 623, 632 (11th Cir.1985), the court went beyond mere observation and took an active part in discussing the pros and cons of presenting certain witnesses (T. 1781–88). Moreover, present counsel is correct in observing that the trial court failed to warn Blanco that his an-

**330**

swers to the court's questions could be used against him at sentencing. Any information from this impermissible inquiry should not have been considered. However, this information, to which the trial court should not have been privy, was so pervasive and prejudicial that it cannot be said with any degree of certainty that the information did not weigh upon the judge's decision at sentencing.[17]

Furthermore, in this instance, Blanco has demonstrated a palpable claim of ineffective assistance. Defense counsel failed to protect their client by revealing Blanco's comments to the court and freely discussing their conversations with Blanco concerning witnesses who could be called to testify at the sentencing phase. The United States Supreme Court in *Strickland* stated that:

[a] capital sentencing proceeding like the one involved in this case, ... is sufficiently like a trial in its adversarial format and in the existence of standards for decision, (citations omitted) that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards covering decision.

*Strickland v. Washington,* 466 U.S. 668, 686–87, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Contrary to the teaching of *Strickland,* at the sentencing hearing, Blanco's counsel let down their guard. Aside from the comments previously mentioned, Mr. Rodriguez, acting as interpreter for Blanco, told the court that Blanco did not care whether the jury recommended a life or death sentence (T. 1789). Rodriguez also stated, without prodding from the court, that although counsel desired to call Blanco's brother, Blanco did not want his brother to testify (T. 1782) because his brother had shown a lack of disregard by not appearing at trial. Blanco therefore

believed that his brother's testimony would not be beneficial (T. 1786). Rodriguez then volunteered that, although Blanco did not want his brother to appear at the sentencing hearing, he contacted him in any event, but that his brother would not likely appear (T. 1786–87). Rodriguez also stated that other possible witnesses had been called but that none of them had contacted defense counsel (T. 1786).

There was no conceivable purpose for revealing these statements to the trial court. Here counsel were deficient in their actions and the confidential information they conveyed proved to be expressly prejudicial inasmuch as the trial court relied upon these statements in justifying the sentence of death (T. 1868–69). For example, the trial court considered this prejudicial information when it determined "that [Blanco] did not care if the jury returned an advisory sentence of life or death [which] ... indicates ... Blanco's lack of concern for his own life [and] manifests that he would be a dangerous person to return to society" (T. 1869). The trial court made the above-conclusion only as a result of its interrogation of Blanco and his counsel concerning the availability of witnesses for the sentencing hearing and the *reasons* for calling or not calling witnesses. Manifestly, counsels' failure to protect their client's rights at the sentencing phase resulted in "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

Based upon the foregoing discussion, it is apparent that Blanco's sentencing was unconstitutionally tainted. A Writ of Habeas Corpus is GRANTED upon the basis stated above and shall issue unless Blanco is afforded a new sentencing hearing before an untainted jury and judge within thirty (30) days from the date of this Order or respondent fails to seek a stay of this

---

**17.** Respondent's position on reconsideration that the trial court merely engaged in a harmless colloquy with Blanco is rejected on the strength of the clear violations demonstrated by the record. This was no ordinary colloquy, and despite the trial court's and even the prosecution's good intentions, there is no denying the facts as stated above. The trial court took control of the defense, and by the time the sentencing phase took place, defense counsel acquiesced in this procedure to the detriment of Blanco. Unfortunately, the prejudice is so apparent, it literally demands that a new sentencing hearing occur.

Order and file a timely appeal. Upon re-sentencing, the above-mentioned colloquies cannot be considered by the trial court or jury.

## CLAIM XIV: TRIAL COUNSEL'S DIS-CLOSURE OF DEFENSE STRATEGY TO COURT

 Blanco also claims that trial counsel provided ineffective assistance because in responding to the Court's requests for information regarding the search for witnesses requested by Blanco, see discussion of Claim XII, *supra*, trial counsel revealed "confidences and secrets" which prejudiced the defense case.

As before, this Court cannot say that trial counsel's disclosures affected the guilt-innocence phase of the trial. More-over, these disclosures were made in re-sponse to the trial court's direct orders. Therefore, trial counsel found themselves upon the horns of a dilemma. Had trial counsel failed to respond to the Court's inquiries, counsel risked acting in a manner contemptuous of the Court's authority. With no real choice available, counsel did as the Court directed.

Blanco's counsel's actions during the sentencing phase, however, are not so defensi-ble. At various times, without prodding, defense counsel volunteered information for no apparent reason, and which could have no effect but to prejudice the outcome of Blanco's sentencing. See discussion at Claim XIII, *supra*.

Accordingly, a Writ of Habeas Corpus with regards to the sentencing phase is GRANTED for the reasons stated above and upon the same conditions as stated in Claim XIII.

## CLAIM XV: INSTRUCTIONS TO JURY REGARDING THEIR ROLE IN SEN-TENCING

 Blanco claims that the trial court, along with the prosecutor, incorrectly led the jury to believe that their role in sen-tencing was insignificant. During *voir dire* and when delivering the sentencing instructions, the trial court impressed upon the jury that:

> [T]he final decision as to what punish-ment shall be imposed is the responsi-bility of the judge. However, it is your duty to follow the law that will now be given to you by me and render to me an advisory sentence based upon your deter-mination as to whether sufficient aggra-vating circumstances exist to justify the imposition of the death penalty.

(T. 1841) (emphasis added).

This Court must first address whether this claim should be summarily denied as procedurally barred, as it was not raised on direct appeal and was subsequently denied by the Supreme Court of Florida in *Blanco II*, 507 So.2d at 1380. This type of claim requires a review of *Caldwell v. Mississip-pi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and its progeny. The United States Supreme Court in *Caldwell* ad-dressed the issue of whether "state in-duced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court" constitutes reversible er-ror. *Caldwell*, 105 S.Ct. at 2640. The Court answered in the affirmative, holding that the trial court's agreement with the prosecutor's statements, gave

> the jury a view of its role in the capital sentencing procedure that was funda-mentally incompatible with the Eighth Amendment's heightened "need for relia-bility in the determination that death is the appropriate punishment in a specific case." (Citation omitted). Such com-ments, if left uncorrected, might so af-fect the fundamental fairness of the sen-tencing proceeding as to violate the Eighth Amendment.

*Caldwell*, 105 S.Ct. at 2645.

Here, the key issue is whether the hold-ing in *Caldwell* is substantial change in the law, which was previously unavailable to raise on appeal, thereby warranting a re-view of the merits by this Court. There is a direct conflict between the Supreme Court of Florida's and the Eleventh Circuit Court of Appeals' interpretation of *Cald-well*. The Florida court has consistently held that "*Caldwell*, which was based in part on prior Florida case law, was not a sufficiently significant change in the law upon which to base a collateral attack." *Phillips v. Dugger*, 515 So.2d 227, 228 (Fla.

1987), citing *Witt v. State*, 387 So.2d 922 (Fla.1980) *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). Other cases decided in the same manner are *Copeland v. Wainwright*, 505 So.2d 425 (Fla.1987) and *Aldridge v. State*, 503 So.2d 1257 (Fla.1987).

In direct contrast to the holdings by Florida courts, the Eleventh Circuit Court of Appeals has likewise addressed this issue under *Caldwell* and has found these claims cognizable "[b]ecause *Caldwell* represents a significant change in the law.... [and this] claim was not reasonably available to [Petitioner] until the *Caldwell* decision, the ... court erred in finding that [Petitioner] had failed to establish cause for any procedural default in the state courts." *Adams v. Wainwright*, 804 F.2d 1526, 1530–31 (11th Cir.1986) *amended on rehearing*, 816 F.2d 1493 (11th Cir.1987) *cert. granted*, — U.S. —, 108 S.Ct. 1106, 99 L.Ed.2d 267 (1988). See also, *McCorquodale v. Kemp*, 829 F.2d 1035 (11th Cir.1987) and *Tucker v. Kemp*, 802 F.2d 1293 (11th Cir.1986). Based upon the law in this Circuit, it is clear that the Supreme Court of Florida was in error in finding the claim procedurally barred and in failing to address its merits.

Turning to the substance of the claim, the test "[t]o make the fundamental fairness determination," is "whether there was a 'reasonable probability that, in the absence of the offending remarks, the sentencing outcome would have been different." *Tucker v. Kemp*, 802 F.2d at 1295, citing *Strickland v. Washington*, 466 U.S. 668, 693–94, 104 S.Ct. 2052, 2067–68, 80 L.Ed.2d 674 (1984) and *Tucker v. Kemp*, 762 F.2 1480, 1483 (11th Cir.1985). Here, the alleged offending remarks began at *voir dire*. The trial court stated to the potential jurors, that [Blanco's] "sentencing is not up to you ... [i]t is up to me" (T. 255) and that "the jury doesn't impose any punishment" (T. 252). Similarly, the Court engaged in the following colloquy:

> THE COURT: Would you be able to leave sentencing, whether it be death or life imprisonment up to me?

> [VENIREMAN]: That would be your job. I'm the one has got (sic) to find him guilty, but I'm not the one who's suppose (sic) to set the sentence.... I would never say kill nobody. Me—that's your job.

> THE COURT: Well, you're right. That is my job.

(T. 260).

▪ The Court discussed sentencing responsibility with another potential juror in front of the venire panel as follows:

> [VENIREMAN]: If I'm selected as a juror, my duty would be to try to the best of my knowledge to determine whether this person did or did not commit the crime.

> THE COURT: And you wouldn't let the sentence, which is my province, interfere with that decision, would you?

> [VENIREMAN]: No, you have to sleep with that.

> THE COURT: Fine.

(T. 421–22).

Another Venireman expressed his relief that, if chosen as a juror, he would not be responsible for imposing the death penalty: "I'm glad I'm not the judge to sentence for that. I could not kill a man myself." (T. 554).

Finally, in his charge to the jury at sentencing, the Court categorically stated, "the final decision as to what punishment shall be imposed is the responsibility of the judge" (T. 1841).[18]

Relying upon *Tucker v. Kemp*, 802 F.2d 1293 (11th Cir.1986), respondent argues that any possible prejudice by the trial court's above-referenced statements was cured when the court instructed the jury "that although your recommendation is considered to be advisory your recommendation of death upon conviction of first degree murder is entitled to great weight" (T. 1846). Respondent further maintains that the Court's statements were ameliorated because it instructed the jury that

---

**18.** The Court has chosen not to cite from the record those instances where the prosecuting attorney made remarks, presumably in violation of *Caldwell*, for reasons which become clear in the discussion to follow.

should it return a recommendation of life imprisonment, the trial court could only impose a death sentence if the evidence was "so clear and convincing that no reasonable person could differ" that such a sentence was appropriate (T. 1775–76; 1803; 1846; 2011). Finally, respondent relies upon the Court's instruction that the jury could consider mercy as a reason for imposing life rather than a death sentence (T. 1846).

Respondent's reliance on *Tucker* is misplaced and its attempts to distinguish *Caldwell* and *Adams* are to no avail. In *Tucker*, the Eleventh Circuit determined that the offending "division of responsibility" remarks did not violate the *Caldwell* standard because the statements were made only by the prosecuting attorney and not by the court. In *Caldwell* and *Adams*, it was the judge's comments which left the respective juries with false impressions as to the significance of their roles in the sentencing process. Moreover, the fact that many of the trial court's statements here occurred during *voir dire* does not diminish the effect that these remarks undoubtedly had on the jury. As the court stated in *Adams*,

> These statements were not isolated or insignificant comments. They were made by the judge at a time when he purportedly was informing the prospective jurors as to their role in the trial.

*Adams v. Wainwright*, 804 F.2d 1526, 1531–32 n. 7 (11th Cir.1986).

This Court's review of the entire record convinces it that the judge's statements to Blanco's jury were more akin to those made in *Caldwell* and *Adams* than to the prosecutor's remarks at issue in *Tucker*.[19] In light of this determination, a Writ of Habeas Corpus, upon the basis stated above shall issue if respondent does not afford Blanco a new sentencing proceeding before an untainted jury and judge within thirty (30) days of this Order or respondent

fails to seek a stay of this Order and file a timely appeal.

## CONCLUSION

In summary, the issues discussed in Claims I, III, IV, V, VI, VII, VIII, IX, X, XI and XII are DENIED. Blanco prevails on the issue discussed in Claim II, however, as a result of this Court's resolution of Claims III and IV, Blanco's request for relief in Claim II must be DENIED. The conviction, therefore, remains undisturbed.

A Writ of Habeas Corpus is GRANTED and shall issue upon the bases stated in Claims XIII, XIV and XV unless Blanco is afforded a new sentencing proceeding before an untainted jury and judge within thirty (30) days of the date of this Order or unless respondent fails to seek a stay of this Order and files a timely appeal.

Petitioner's Motion for Appointment of Counsel Pursuant to the Criminal Justice Act is GRANTED. Mark Evan Olive shall continue to serve as Petitioner's counsel pursuant to 18 U.S.C. Section 3006A.

---

**19.** On reconsideration, respondent directs this Court's attention to two recently decided Eleventh Circuit cases, *Mann v. Dugger*, 844 F.2d 1446 (11th Cir.1988) and *Harich v. Dugger*, 844 F.2d 1464 (11th Cir.1988). However, contrary to respondent's contention, these cases support rather than repudiate this Court's determination. In both cases, the Eleventh Circuit emphasized the difference between cases where the prosecutor's improper remarks are *corrected* by the trial court and those cases where the comments are *aggravated* by the trial court. The situation presented here is the latter, not the former.